75 So.2d 818 (1954)
Leonard W. COOPERMAN et al., Appellants,
v.
WEST COAST TITLE COMPANY et al., Appellees.
Leonard W. COOPERMAN et al., Appellants,
v.
GUARANTEE ABSTRACT COMPANY et al., Appellees.
Florida Association of Realtors, St. Petersburg Board of Realtors, Warren P. Hunnicutt and other individual real estate brokers, and The Florida Bar, Intervenors.
Supreme Court of Florida. En Banc.
November 5, 1954.
Rehearing Denied December 8, 1954.
Leonard W. Cooperman, Walter G. Ramseur, St. Petersburg, Hubert C. Smith, Fort Lauderdale, Unauthorized Practice Committee of The Florida Bar, Darrey Davis, President of The Florida Bar, J.A. McClure, Jr., St. Petersburg, as President of St. Petersburg Bar Ass'n, for appellants.
Harold A. Kooman and William S. Fielding (of Grazier, Fielding, Greene & Coit), St. Petersburg, for West Coast Title Co.
Baynard, Baynard & McLeod and Carroll R. Runyon, St. Petersburg, for Guarantee Abstract Co.
*819 W.H. Poe of Maguire, Voorhis & Wells, Orlando, for intervenors-appellees.
Wm. H. Rogers, Jacksonville, amicus curiae.
THOMAS, Justice.
The original plaintiffs were members of The Florida Bar practicing law in St. Petersburg and officers of the St. Petersburg Bar Association and the original defendants were Florida corporations engaged in the business of preparing abstracts of title to real property and issuing policies of title insurance as agents of title insurance corporations. In the course of the proceedings in the chancery court, Florida Association of Realtors, St. Petersburg Board of Realtors, Warren P. Hunnicutt and other individual real estate brokers, and The Florida Bar were permitted to intervene.
It was charged in the bills that West Coast Title Company and Guarantee Abstract Company were, in effect, representing that they were qualified to practice law; that they were giving legal advice; and that they were preparing deeds, mortgages, and other instruments incident to conveyancing, and forms necessary to the procurement of guaranty or insurance of loans by the Federal Housing Authority and the Veterans' Administration. It was further asserted that these companies were rendering opinions on the quality of titles of various tracts of real estate based on examinations made by their employees.
The court was asked to determine whether the challenged acts constituted unauthorized practice of law and if so, to enjoin such activities on the part of the corporations.
The corporations denied that they gave legal advice, but admitted that they filled out the forms required by the Federal Housing Authority and the Veteran's Administration for the guaranty or insurance of loans, and admitted also that they examined titles and issued commitments for title insurance. They asserted that all examinations were made simply to determine the insurability of title.
After much pleading and intervening and taking of depositions, the chancellor decreed that these appellees could with impunity fill out standard forms of conveyancing instruments and alter them to suit the occasion, so long as they were acting as agents for their principals, the title insurance companies. He also held that these appellees could decide from the examination of abstracts and public and other records whether as agents they would grant commitments for policies of insurance eventually to be issued by their principals. He ruled that the companies could complete forms requisite to guaranty or insurance of loans by the Federal Housing Administration and the Veterans' Administration. "Real estate brokers," he decided, could complete standard conveyancing forms such as preliminary contracts, deeds, mortgages, notes, assignments and satisfactions where in the instruments, subsequent to the contract, only names, dates, descriptions, amounts and "latest tax year liability" were to be inserted.
In the appeal from this decree the appellants have brought us three questions for our consideration. The first two deal with the activities of the corporations and the third with the activities of "realtors."
The gist of the immediate controversy, so far as it concerns the two corporations, is the extent to which they may go; first, in advising themselves about the condition of the title in a prospective grantor in order to determine whether a commitment to insure it should issue; and second, what they may do in respect of getting the title transferred to the grantee in such way that their principals will assume the risk of insuring an interest or a loan, that is, honor the agents' commitments.
The history of a typical transaction will make the question and, we hope, the solution, simpler. When a customer applies for title insurance, the agent causes an examination to be made of its own records, the public records, and available abstracts of title, for the purpose of ascertaining and reporting to its principal whether the title is insurable. If the condition of title in the *820 grantor as it is evaluated from these sources justifies the action, the agent issues in its own name a `commitment' for title insurance showing defects, and excepting items not to be insured, if any. In the commitment it is stipulated that the policy will issue upon payment of the premium and upon recordation of a proper instrument from grantor to grantee creating the estate or interest to be insured. So the commitment is made before, the policy is issued after, the transfer.
As we understand the procedure, the agents, if the closing takes place in their offices, after the commitment is made, prepare final statements, complete forms of deeds, mortgages, notes, assignments and satisfactions, and supervise their execution, check intangible taxes, compute proration of taxes, interest, and rents, draft assumption clauses, and construct clauses showing that property is taken subject to restrictions and easements.
When all requirements are satisfied and insurability of a particular title or interest in the grantee is reported by the agent to its principal, the policy is issued, and there is no charge for any of the services rendered by the corporation except the premium in which, presumably, it and its principal share. In cases where the corporation acts as disbursing agent of loans secured from the Federal Housing Authority or the Veterans' Administration either connected or unconnected with title insurance a fee is charged for the service.
We accept appellants' premises that a person unauthorized to do so may not practice law, either in a court or an office, and that a corporation may not practice law under any circumstances. Our concern in this phase of this controversy is whether the appellee-corporations are practicing law in all or part of their functions as representatives of other corporations engaged in issuing title insurance policies. The solution is difficult because of the lack of a definition of "practice of law." Clearly the appellee-corporations cannot hold themselves out to all persons as advisors on legal matters and as scriveners whose services are available for a fee to all who may seek them. Nor could they appear in court to represent a litigant or defend an indictee.
In our opinion the appellee-corporations may take such steps as necessary to inform themselves of the status of any title to insure which they are asked to issue a commitment. So, from the examination of their own records, abstracts that may be furnished, and the public records accessible to all, they may ascertain the state of title at the time. Up to this point we feel no hesitancy in holding that in the search for intelligence upon which must depend the decision either to issue or decline a commitment, the corporations cannot be said to be engaging in the practice of law, for to practice law one must have a client and in such instances their clients are themselves. Obviously the information to the time of commitment relates to the condition of title or interest of the proposed grantor, not of the prospective grantee to whom the policy will finally issue if the obligation is undertaken by the appellee-corporations' principals.
Having concluded that the appellee-corporations may advise themselves about a present condition of title, we come to the question: What then, may they do towards effecting a transfer in such manner that the interest or title of the grantee will be of such quality that the principal will assume the risk and honor the commitment?
In answering this difficult question, we think it should be borne in mind that the prime purpose is to determine the nature of the risk and that the effect of the transfer on the chain of title is consequential. When the corporations supervise the transfer, they are not undertaking to see that a flawless title vests but that a title is passed which they will insure despite any flaws. So long as they are but satisfying themselves and their principals that the premium justifies the risk, we cannot see the logic in requiring that from the time the commitment issues, they must employ counsel, else they will be charged with practicing law.
We do not understand that the appellees undertake to pass primarily upon the marketability *821 or validity of the title or interest, but upon its insurability. In other words, the whole effort of the appellee-corporations is to determine the risk that will be taken if the policy issues. Conceivably a title that would not be declared merchantable by a careful attorney might nevertheless be insured by charging a premium that would compensate for the risk that would be run due to a defect of some kind or other.
If the purchaser wishes to engage an attorney to advise him relative to the marketability of the title, as distinguished from its insurability, there is nothing to prevent his doing so.
The fact that the remuneration of the appellee-corporations consists solely of their part of the premium and that their incentive to accomplish an acceptable transfer is to earn that premium but emphasizes the thought that in such activities after commitment they are still representing themselves. We have not overlooked the contention of the appellants that in these transactions the corporations are, in effect, practicing law because they are agents, hence their principals are their clients. But the whole picture and especially that part of it relating to the manner and source of compensation for their labors repels us from the view adopted by the appellants.
So we decide that what the companies do to inform themselves about the advisability of issuing a commitment and what they do to accomplish a transfer of a title or interest of such kind that a policy of title insurance is warranted are not services the performance of which amount to unauthorized practice of law. But what we have written applies only to the performance of those acts which are indispensable to the determination of insurability and must not be construed as sanctioning a charge of any sort, in addition to the premium for the issuance of title insurance, or approving charges for services rendered in connection with the guaranty or insurance of loans by the Federal Housing Authority or the Veterans' Administration, whether the loans be connected with title insurance transactions or not.
Before passing to the final question we should observe that evidently at one time the appellee-corporations gave advice relative to the effect of taking title as estates by the entirety and completed instruments and acted as escrow agents in transactions where no title insurance was involved, but these actions have now been enjoined by the lower court's decree entered in this cause and as there seems to be no challenge of this part of the decree, there is no need further to discuss this aspect of the case.
Question three, prompted by the admission into the case of real estate brokers, challenges the propriety of brokers' completing conveyancing and other related standard forms when they have no interest "except as brokers."
In the case of Keyes Co. v. Dade County Bar Ass'n, Fla., 46 So.2d 605, we decided the question now presented and we do not find occasion to deviate or recede from that opinion. The chancellor's view of the importance of the preliminary memorandum as expressed in his decree did not coincide with the opinion we expressed in the cited case. As a consequence, his premise sent him in a direction we cannot approve.
In the main the decree is affirmed, but those parts of the decree inharmonious with the views we have expressed or with the case just cited are reversed.
Reversed in part; affirmed in part.
ROBERTS, C.J., and SEBRING, HOBSON, MATHEWS and DREW, JJ., concur.
TERRELL, J., not participating.