BAR ASSOCIATION OF TENNESSEE, INC., et al.,
Complainants, v. UNION PLANTERS TITLE GUAR-
ANTY COMPANY et al., Defendants.—326 S. W. (2d)
767.

No. 3, Shelby Equity

Western Section.   February 25, 1959.

Certiorari Denied by Supreme Court June 5, 1959.

Petition to Rehear Petition for Certiorari Denied July 27, 1959.

Vincent Beal and Ramsay Wall, Memphis, Shepherd, Heiskell, Williams, Beal & Wall, Memphis, of counsel, for Mid-South Title Co., Inc.

Walter P. Armstrong, Jr., and J. E. McCadden, Memphis, Armstrong, McCadden, Allen, Braden & Goodman, Memphis, of counsel, for Commerce Title Guaranty Co.

Jack Petree and Charles C. Crabtree, Memphis, amici curiae.

John S. Porter, Leo J. Buchignani, and Thomas F. Turley, Jr., Memphis, for appellees.

BEJACH, J. This cause involves a suit by the Bar Association of Tennessee, Inc., The Memphis and Shelby County Bar Association, Inc., and Leo J. Buchignani, Ferber S. Floyd, David N. Harsh, David Keeble, and Thomas F. Turley, Jr., individual lawyers and members of committees of said Bar Associations, against the Union Planters Title Guaranty Company, the Commerce Title Guaranty Company, and the Mid-South Title Company, seeking an injunction against said defendants to restrain them from the unlawful practice of law, which is alleged to consist of advertising for business, of drawing various papers and documents, such as deeds of conveyance, mortgages and trust deeds, and other papers not necessary for the functioning of said defendants in

their authorized field, namely that of guaranteeing titles to real estate.

Pending the hearing of this cause in the lower court, the Union Planters Title Guaranty Company disposed of its assets to the Commerce Title Guaranty Company, and discontinued its former activities. The bill was thereupon, by consent, dismissed as to said Union Planters Title Guaranty Company, and no appeal has been taken from that action of the Chancellor. The cause proceeded to a final adjudication by the Chancellor as to the other defendants. The cause was tried on proof taken by depositions and heard according to the forms of Chancery. The Chancellor dismissed the bill as to the defendant Commerce Title Guaranty Company, but sustained it, in part, as to the defendant Mid-South Title Company and enjoined it from, ''Preparation of conveyancing or related instruments, and/or giving of legal advice relative thereto, when such acts are performed for, or on behalf of, parties to a real estate transaction, by any person, lawyer or other, in the salaried employment of the defendant, and/or when performed in its office or place of business, whether such acts are compensated for by defendant corporation, by the parties to the transaction or are uncompensated.'' The Mid-South Title Company was further enjoined from, ''Knowingly issuing commitments to insure the title to real property where such commitments are procured or sought for the purpose of obtaining an opinion as to the validity or state of the title to said real property and without a present intention on behalf of the applicant to procure title insurance; and from imposing any restrictions or conditions upon the manner or place of performing any acts required of a lawyer representing a party to a real estate

transaction.'' Both the complainants and the defendant Mid-South Title Company prayed appeals and have perfected their appeals to this court, where they have filed assignments of error.

The parties will be referred to, as in the lower courts, as complainants and defendants, or called by their respective names. It will not be necessary to copy into this opinion either the assignments of error of the complainants, or those of the defendant Mid-South Title Company. Both are somewhat lengthy. Suffice it to say, the respective assignments of error present adequately all questions which this court is called on to adjudicate. The complainants complain of the refusal by the Chancellor to sustain all of the allegations and prayers of their bill, but especially of his dismissal of the bill as to the defendant Commerce Title Guaranty Company. The defendant Mid-South Title Company complains of the action of the Chancellor in sustaining any of the allegations of the bill against it; and, in addition, it contends that even if some or all of the allegations of the bill should be sustained, no injunction should issue. On January 15, 1958, after the Chancellor had on November 22, 1957, filed his opinion in this cause, and on January 6, 1958, a supplemental opinion disposing of a petition to rehear, five staff attorneys of the defendant Mid-South Title Company filed a petition for leave to intervene in the cause. Said petition was filed prior to the entry of the final decree on January 31, 1958. On January 30, 1958, the Chancellor filed an opinion denying the right of intervention, but, by consent of all parties, Jack Petree, Esq., solicitor for those who sought thus to intervene, was appointed amicus curiae. In addition, Mr. Petree has been granted leave by an order entered in this

court to appear as amicus curiae. Also, a petition for leave to file a brief as amicus curiae has been filed in this court by the Mortgage Bankers Association of Memphis and the Home Builders of Memphis, through their solicitor, Charles C. Crabtree, Esq. Such permission was granted, and the brief filed along with said petition has been considered.

Although the record before us is quite lengthy, consisting of 541 pages, in addition to numerous exhibits filed in the cause, there is little or no dispute as to the facts of the case. These facts are fully set out in the opinion of the learned Chancellor filed November 22, 1957, together with his reasoning and ruling on the issues presented. From that opinion we quote, as follows:

"The suit was filed on September 30, 1955. Subsequently, Union Planters Title Guaranty Company sold its physical assets, including its abstract plant, to Mid-South Title Company and is not now engaged in any manner in the title insurance business. Upon motion of complainants, the action as to Union Planters has been dismissed. Two defendants therefore remain — Mid-South and Commerce Title Guaranty Company.

"Complainants admit that defendants are entitled to engage in the title insurance business, but they allege that in doing so, some of defendant's acts constitute the unlawful practice of law, which complainants want enjoined. Defendants deny that any of their acts are unlawful or that an injunction should issue.

"The respective positions of the parties will be treated more carefully hereinafter.

"I. *The Position of Commerce Title Guaranty Company*

"In 1954, prior to the filing of the bill, Mid-South and Commerce Title entered into a contract for a period of twenty-five years whereby Mid-South became the exclusive agent for Commerce Title in the issuance of title policies. By this agreement, Commerce Title assumed the status of an insurer of all of the business written by its agent, Mid-South, although Mid-South retains some liability under the policies written. None of the activities of which the bill complains are directly engaged in by Commerce Title or its employees. As a matter of fact, the proof shows that the only full-time employee of Commerce Title is its president and general counsel, the Honorable Samuel O. Bates. There is no proof to the effect Judge Bates examines titles, prepares instruments, closes trades, or in any manner performs any act which might be construed as the unlawful practice of law.

"Nevertheless, complainants say that any relief to which they are entitled should be directed toward both defendants because of their relationship to each other. Commerce Title takes the position that because of its contract with Mid-South, it is 'irrevocably wedded' to Mid-South for a period of twenty-five years and, therefore, any action of the Court detrimental to Mid-South would indirectly affect it.

"The Court is impressed with the attitude of Commerce Title and considers it a noble gesture to offer to stand by the side of its bride, for better or for worse. The suit, however, seems to be complicated enough without involving an unnecessary party. Not one act of which the Bar Associations complain can be attributed

to Commerce Title, and the Court doesn't feel obligated to permit a party to remain in the lawsuit just for the ride. The suit as to Commerce Title is therefore dismissed and Mid-South remains as the only defendant.

"II. *Background and History*

"For many years Commerce Title and Union Planters have operated title insurance business in Memphis. About 1946 Mid-South was chartered and became a competitor of these two corporations. There is no doubt that the popularity of title insurance has greatly increased in recent years with the public. Some of this has been brought about by the advertising and solicitation for business of which the Bar complains. Regardless of how defendant obtains its business, it is apparent that many purchasers of realty, and practically all lenders who furnish the funds for financing, insist that the title to the property be adequately insured. It is interesting, then, to follow the procedure when application for title insurance is made.

"Defendant says that the customer is first advised that it is necessary for him to obtain legal assistance in consummating the real estate transaction so that the title policy may issue. Further, that whenever the customer requests any particular attorney, it honors this request; that the customer is therefore given a choice as to who will handle the legal aspects of the transaction for him; that if no choice is made, defendant will, upon the customer's request, recommend a lawyer.

"Defendant employs, on a salary, several licensed attorneys who are referred to as its staff attorneys. In addition, there are a total of about 106 lawyers engaged

in private practice here who are approved by defendant to examine titles. These are referred to as outside attorneys. Defendant says that it relies upon the title examination of these outside attorneys in about fifty percent of the titles which it insures.

"Lawyers who examine titles for defendant are compensated for this services as follows. In the case of the staff attorneys, they are paid a fixed salary. Outside attorneys are paid a percentage of the title premium, generally one-third of the charge made.

"Prior to 1946, the title companies made no charge to its customers for preparing the conveyancing instruments where title policies were requested. The Bar Association complained of this practice and thereafter an 'attorney' or 'instrument' fee was charged for this work. When instruments were prepared by staff attorneys, the fees were collected by defendant and paid to their attorneys as funds were disbursed. When an outside attorney handled the transaction, he was paid a fee by his client. Subsequently, staff attorneys requested that instrument fees not be paid to them following each closing, but that the fees be held and pooled and distributed to the staff attorneys as requested by them, generally weekly or monthly. The proof shows that the title companies do not share in the instrument fees which their staff attorneys receive and that the fees are in addition to the salaries paid to these attorneys.

"Complainants say that defendant engages in the unlawful practice of law by the preparation of instruments and giving advice relative thereto; by holding itself out as performing legal services, and by serving as a con-

duit for channeling legal business both to its staff and its outside lawyers.

"Defendant contends: That it does not draft legal instruments nor hold itself out to the public as doing so nor furnish legal advice; that the instruments are prepared and advice given by independent attorneys, who do not act as representatives of defendant, but who act on their own behalf, in an independent attorney-client relationship with defendant's customers; that defendant does not control in any manner the activities of its staff or outside attorneys; that all fees paid for advice and preparation of instruments are retained by these attorneys; that should its customers not have attorneys of their own choice, defendant, acting as agent for its customers, employs attorneys for them, which they are entitled to do.

"In the alternative, defendant says: That if there is anything improper in the procedure which it now follows, it nevertheless should be permitted to have instruments prepared at *no charge* to its customers because it has an interest in the correctness of the instruments; that this is incidental to its business and that it is the 'real party in interest' to the document prepared, since it must insure the risk; further, that the public interest is best served by permitting the same attorney who examined the title to prepare the instruments.

"III. *The Procedure in Issuing the Title Policy*

"In order to thoroughly consider the charge of unlawful practice, the Court feels it proper to outline in detail the procedure followed in issuing a title policy. The steps are:

"A. *Examination.* When the order is placed for title insurance the matter is referred to an attorney who proceeds to:

"(1) order an abstract of title;

"(2) examine the abstract and other pertinent records;

"(3) issue his opinion or specification of requirements to perfect the title so that instruments may be drawn, the sale closed and the policy written.

"B. *Preparation for Closing.*

"(1) Any instruments necessary to meet the requirements are prepared, such as affidavits of heirship. If the title examination reveals any tax or other lien against the property, the attorney will either insist that the lien be immediately satisfied or that funds be held out of the settlement for this purpose.

"(2) The attorney then prepares the necessary instrument to convey title, that is, the warranty deed to be executed by the seller. It is customary to prepare an affidavit against mechanic's liens upon the property, which is also executed by the seller. If a loan is involved, the same attorney usually prepares the trust deed or notes to be executed by the purchaser. Other legal documents, as required, are drafted.

"(3) Any advice requested by either the seller or purchaser relative to the status of the parties or to the legal effect of the instruments is given by the attorney who prepares them.

"C. *Closing.*

"(1) Upon the preparation of all necessary instruments, the parties are generally called together to execute them.

"(2) At this time, they are presented with a settlement sheet which reflects the financial status of the parties, that is, the amount of money required by the buyer to complete the purchase, the sum which the seller will receive, and other pertinent information.

"(3) The attorney, or closer, either individually or through the title company, proceeds to disburse the funds as reflected by the settlement sheet.

"D. *Issuance of Policy.*

"(1) All instruments requiring recording are thereupon filed.

"(2) All instruments are examined to determine whether they conform to requirements and that they are correct in description and otherwise.

"(3) Upon being satisfied of these facts, the company then issues its policy of title insurance, either to the purchaser, as an owner's policy, to the lender, as a mortgagee's policy, and in some cases, to both.

"The position of the parties relative to each of these steps is as follows:

"*Step A. Title Examination.* Of the many features of this suit, this is the simplest to adjudicate because the contention of the parties is not in conflict. Complainants admit that defendant has every right to make the title examination. Defendant's charter permits this as does

the Title Insurance Law, section 56-3401 et seq. T. C. A. Furthermore, all authorities considered hold that title companies may perform this step. The Court, therefore, holds that this does not constitute the unlawful practice of law.

"*Step B. Preparation for Closing.* This is the most difficult question raised in the suit, and will be treated in detail hereinafter.

"*Step C. Closing.* The execution of the deeds by the parties may be performed before any notary public, and does not involve the practice of law. The preparation of the settlement sheets, in the Court's opinion, is entirely a clerical procedure which does not require the services of a lawyer and, therefore, cannot be considered as the unlawful practice of law, and the Court so holds.

"Disbursements of funds, of course, may be done by any lawyer, layman, or corporation, so empowered, such as defendant. There is proof to the effect that many lenders of funds for the building and purchase of homes in this area are located away from here. It is a most natural requirement of these lenders that a financially sound institution handle disbursements of funds furnished.

"The chief objection which complainants raise to defendant engaging in Step C is that the parties to the transaction at this point seek legal advice as to the effect of their action. This is not necessarily so, the Court being of the opinion that the proper time to so advise the parties is upon the preparation of the instruments, covered in Step B. The Court, therefore, holds that nothing in Step C constitutes the unlawful practice of law.

"*Step D. Issuance of Policy.* It is the Court's opinion that the title company has as much right to examine the conveyancing instruments, after they are prepared and executed, as it does to examine the title in the first place. These instruments must be correct, just as the title must be perfected, in order for the title policy to issue. The matter of recording the deeds is a mechanical act, as is the writing of the policies. The Court, therefore, holds that there is nothing to Step D which may be considered to be the unlawful practice of law.

"The subject of the litigation is therefore narrowed to defendant's activities involved in performing Step B. Each of the defenses previously set forth will be thoroughly considered.

"*IV. Defenses: The Defendant Doesn't Prepare Instruments or Give Legal Advice*

"The title company says: (1) That it does not draft instruments; (2) That they are prepared by independent lawyers, not acting as representatives or agents of defendant; (3) That a relationship of independent attorney-client exists between said lawyers and defendant's customers; (4) That defendant is entitled on behalf of its customers to employ lawyers for them, if so requested.

"A consideration of this proposition necessarily requires a separate analysis of work performed by staff attorneys and by outside attorneys.

"A. *The Position of the Staff Attorney.*

"(1) The first proposition is that defendant doesn't prepare the instruments. If it doesn't who does? Certainly, from the mechanical standpoint, defendant does.

All stationery and supplies are furnished by defendant. The typewriter which the stenographer uses and the stenographer herself are furnished by defendant. The office space, telephone, furniture and equipment which the stenographer and which the staff attorneys use are furnished by defendant. No doubt defendant would say that the mechanical preparation of instruments is not contemplated in this discussion and is unimportant and trivial. If so, perhaps a practicing lawyer who pays his own expenses should be consulted.

"Who prepares the instruments from the legal aspect? Defendant's salaried staff attorney directs defendant's stenographer in the typing of the instruments and checks them for accuracy upon completion. It is evident that defendant does handle the legal phase of preparing instruments, through staff attorneys, on defendant's time, in defendant's office and with the aid of defendant's employees and equipment. There is no difference between this operation and as it existed prior to 1946 except that now staff attorneys receive a fee for work they formerly performed under salary arrangements with the title companies.

"The controlling factor, then, as to whether or not defendant prepares instruments is the receipt of fees by staff attorneys. Yet, defendant treats this so lightly that it now offers to waive fees and revert to the previous 'no charge' practice. By its inconsistent position, it has lost a sound basis on which to stand. The Court, therefore, reaches the inescapable conclusion that defendant does prepare the instruments, and as an incident, furnishes advice to its customers relative thereto.

"(2) The next proposition is that the instruments are drawn by independent lawyers, not acting for defendant. This calls for a consideration of the word 'independent'.

"The simplest definition for 'independent' comes from Webster's Elementary Dictionary. In part, this definition is: 'Not under another's *control* or rule; not having *connections* with any other or each other; *separate';*

"The Supreme Court of Tennessee has declared, in Rule 38, that 'the ethical standards relating to the practice of law * * * shall be the Canons of Professional and Judicial Ethics of the American Bar Association'. Complainants point out that Canon 35 provides that the 'professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer.'

"Complainants say, further, that when staff lawyers represent the parties to a real estate transaction, as well as defendant, a situation arises where the interests of the parties could be 'adverse', which violates Canon 6; that in such circumstances, the interests of defendant would be paramount and that defendant thereby 'controls' the services of its lawyers in violation of Canon 35. Actually, there isn't much possibility of adverse interest appearing in these transactions, but if they did, defendant would no doubt insist that the parties obtain separate counsel.

"But in considering the use of the word 'control', it is evident that both the employment and the income of staff attorneys is controlled by defendant corporation and to this extent these lawyers just can't be said to be entirely independent. Salaried persons generally can't afford to be.

"As for the rest of Webster's definition, the 'connections' between staff attorneys and defendant are self-evident. And to say that defendant and its staff attorneys are 'separate' is unrealistic. Therefore, under any reasonable interpretation of an 'independent' relationship with defendant, staff attorneys just won't qualify.

"(3) This brings on the third phase of this defense, that the 'independent lawyer-client' relationship exists between defendant's lawyers and its customers. The first requisite of this relationship is a client. There are not many requirements for being a client. He'd just be a person who needs legal aid and presumably can pay for it. He is entitled, however, to choose his own attorney, and to expect that he will be represented capably. The right by the client, then, to choose or select his own lawyer is the very essence of the relationship. When defendant's customers make application for a title policy, defendant says that a choice as to attorney is allowed. But if the customer has no choice, an attorney is assigned to him and he takes what he gets. This is no reflection upon staff attorneys because they are all capable or they couldn't hold their jobs. But this doesn't alter the fact that the element of voluntary selection is often missing.

"For a true relationship to exist there must also be a lawyer—not just a person who owns a license but one who fulfills the exacting demands of the profession as well as the requirements of the public's conception. Since staff attorneys occupy a unique position in the law business, it might be well to compare them with private practitioners.

"(a) The method of which staff attorneys obtain their fee business is subject to question. When the customer has no lawyer he is introduced to a staff attorney. This is an indirect, but inescapable, result of the defendant's advertising and solicitation. Defendant says it doesn't advertise legal services but, even so, the effect is to keep its staff attorneys well supplied with legal business. It is far fetched for defendant to assert as a comparison that many lawyers who represent liability insurance carriers obtain their business as a result of the advertising which the insurance carrier has done in an effort to obtain new policly holders. The facts of the case at bar prove a far more direct effect realized from advertising and solicitation. Many a private practitioner would consider himself in paradise to have his business brought to him daily on a platter. The only conclusion is that defendant does 'channel' business to its staff attorneys.

"(b) As previously stated, staff attorneys pay no overhead expense in the handling of their fee business. The result is that they are either able to charge less fees for their services or they show more profit for time spent than the practicing attorney, which is a very unfair advantage and results in unfair competition. The fees charged by staff attorneys, although based upon the Bar's Minimum Fee Schedule, frequently represent the maximum fees which may be charged by other lawyers. Thus the matter of instrument fees for the whole Bar is controlled to some extent by a handful of staff attorneys, and indirectly by defendant, because it makes the lower fees possible.

"One of the excuses advanced by defendant for the preparation of instruments by its staff attorneys is that

this is more economical and, therefore, the public is better served. This thought has also been expressed by certain of defendant's witnesses, prominent local realtors and builders. The Court finds fault with this attitude because the profits and commissions made by the realtors and builders are not based upon the economy to the public, but are based upon what will fairly compensate these people for their services. This should be the basis for payment of services of attorneys, but the court knows that the instrument fees charged by staff attorneys 'control the market' to some extent, regardless of the value of the services rendered.

"(c) Defendant urges that the interest of the public and the public welfare require that title policies should be issued with efficiency, expediency and economy which is accomplished where staff attorneys are used; that when the public welfare conflicts with that of the Bar, the interest of the bar should give way. Since the public welfare has been made such an issue, it is well to consider the subject from all angles.

"The Court is of the opinion that the dignity of the legal profession is also a matter of public interest and that it is in the public interest that this be upheld; that the concept which the public has of a lawyer is important; that his surroundings and environment mean something to the public; that the public interest is not best served by having the title company present to its customers a staff lawyer, practicing his profession in the middle of a business office, surrounded by every indicia of commercialism, with a law library, trademark of the profession prominent by its absence. It is quite one thing for a lawyer, in the full-time salaried employ of a corporation, to be located in such surroundings. It is quite another

to have him held out to the public as an independent, private practitioner.

"There are many people who fortunately and happily have no occasion to come in contract with lawyers except in the purchase or sale of a home. The Court doesn't think it is in the interest of the public to gauge the whole legal profession by the situation in which it finds these staff attorneys. Clothes don't make the man. Neither do dignified professional surroundings make a lawyer. But this is what the public expects.

"(d) One of the important services undertaken by the legal profession is the representation of indigent clients. Every practicing attorney, in the course of his career, is expected to and does employ some part of his time which might be used profitably otherwise, in representing people who can't pay a fee. There is really no occasion for staff attorneys to perform free legal services because, obviously, people who can trade in property can afford the incidental expense. But the fact remains that they don't make this important contribution to the public welfare.

"The Court wishes to emphasize the fact that this is not a personal attack upon the staff attorneys. It is, however, a challenge to the system which employs them. The Court recognizes that these are able men in their line and holds them in the highest personal regard. They have chosen, however, to use their licenses differently from the practicing attorney.

"For the many reasons stated, some more relevant that others, the Court just can't accept defendant's theory that an independent lawyer-client relationship exists between its lawyers and its customers.

"(4) The last proposition raised in this defense is that defendant, as agent, is entitled, upon request, to employ an attorney for its customers, which employment would create the relation of attorney and client between the principal and the attorney so employed. The Court acknowledges this to be a correct legal position as pronounced by our Supreme Court in the case of State [ex rel. District Attorney] v. Lytton, 172 Tenn. 91, 110 S. W. (2d) 313. But this Court doubts that the Supreme Court contemplated any such situation as is found here, the 'independent' lawyer feature being absent.

"Upon a consideration of all these matters, reason requires that the Court reject defendant's theory that it does not prepare the conveyancing instruments where same are prepared by a lawyer in the salaried employ of defendant.

"B. *The Position of Outside Attorneys.*

"The Court accepts defendant's theory that it does not draft instruments, when this work is performed by outside attorneys, that is, private practitioners on defendant's approved list.

"But the Bar finds some fault with the activities of these lawyers, which requires comment upon the subject.

"(1) Complainants say that defendant serves as a conduit for business which comes to outside lawyers just as in the case of the business which comes to the staff attorneys. This may be, but under the authority of the Lytton case, defendant has the right to employ counsel for its customers upon their request. The relationship between defendant and its outside attorneys is the situation which this Court believes our Supreme Court had in

mind in its holding—not one where the attorney is in the salaried employment of the agent.

"But in asserting this contention, the Court thinks complainants overlooked one important point. While it is true that about one-half of its legal business is performed by these outside lawyers, it is not true that this is all handed to them by defendant as in the case of staff attorneys. Many entirely capable lawyers who, twenty years ago, would have closed real estate trades, using their own opinions as a basis, now recognize the fact that title insurance gives more security to their clients, considering the imminence of death and the possibility of insolvency. As a result, many attorneys, in their clients' best interest, do recommend title insurance and proceed to take all steps required to obtain it. Their position, then, is not that of having this business handed to them, but, rather, of bringing the business to the title companies who refer it back to them for processing.

"(2) Complainants also say that to some extent the outside attorneys are guilty of splitting fees in that they take a percentage of the title premiums as their fee for examining the title. Defendants say this is not the case at all; that the matter of splitting fees is not involved because the outside lawyers take a percentage of the premium charged, which is not a legal fee.

"(3) The Court considers that the serious question of unlawful practice involved is not the 'splitting' but rather the 'control' of fees paid these lawyers for title examination, that is, a flat one-third of the title premium regardless of the amount of work performed. For instance, if the sale involved a vacant lot with a value of $1,000.00, the title premium is $25.00, of which the fee

is one-third, or $8.33, which is too small to really justify a lawyer's time. Actually, the premium charged would need to be $75.00 in order to pay the lawyer the long recognized minimum of $25.00 for title examination. The Court realizes, of course, that where a title premium of only $25.00 is being charged, defendant can't pay a $25.00 fee.

"The fault which the Court finds with the present system is that the fee is fixed and controlled entirely by the defendant, with no consideration given to the value of services by the examining attorney. This, the Court thinks is improper. The Minimum Fee Schedule recommended by the local Bar Association does not set a minimum fee for this work, but this statement is made:

" 'The price to be charged for examination of title shall be based solely upon the contractual relation of the individual with his client, taking into consideration the various factors of work and responsibility involved.'

"The Court does believe that a fee, which would more reasonably compensate, could be paid outside attorneys for examining titles. To this end, the parties to this action might cooperate. Outside Shelby County, defendant apparently charges a premium of $3.50 per thousand for the insurance risk, to which is added the charge made by the examining attorney. This appears to the Court to be reasonable.

"V. *Defenses:* Defendant Is the 'Real Party in Interest' and is Therefore Entitled to Prepare the Instruments.

"Defendant's alternative defense is that if the Court finds anything improper in its present method of operation, nevertheless, defendant should be permitted to pre-

pare instruments at no charge to its customers, because defendant is the real party in interest to said documents.

"From a practical standpoint, the first apparent objection to this procedure is that the inherent right of the outside attorney to prepare instruments for a fee may be eliminated. Granted, that defendant could adjust the salaries of its staff attorneys to compensate for a loss of instrument fee income. But where does this leave those outside lawyers who perform one-half of the legal services required by defendant. There would be no fees from clients. Defendant could pay them flat fees. This would probably require an increase in title premiums but whether or not it does, it is 'kidding the public' to say that no charge is made for drafting instruments. This fact is astutely pointed out in the Hexter case, quoted hereinafter.

"But aside from this question, the legal position taken by defendant has been tried many times before and the Court has sound authorities on which to rely in reaching a decision.

"Title companies occupy a relationship to law unlike that of any other commercial enterprise known to the Court. The basis for a title policy is an opinion rendered by a qualified lawyer, and supported by legal instruments which fulfill the requirements. The title business is absolutely dependent upon and can't operate without this close association with the legal profession.

"In considering this question, therefore, the Court feels that only those authorities which deal with the title business are important and controlling, rather than those involved with other commercial endeavors. Unfortunately, there is no reported Tennessee case relating di-

rectly to this subject. The Court has therefore carefully considered decisions rendered elsewhere, and especially those relied upon by both parties to this action.''

█ It is apparent from a consideration of the Chancellor's opinion, and especially from that portion of same quoted above, that his decision was influenced or motivated by a desire to protect the lawyers of general practice from what he considered unfair competition. In our opinion, this is not the proper test to be applied in determining whether or not defendants, or either of them, are guilty of unlawful practice of law and whether or not an injunction should issue.

All the defendants are, or were, operating under the provisions of Chapter 1734, Public Acts of 1955, carried forward into Tennessee Code Annotated as Sections 56-3401 to 56-3427, entitled ''Title Insurance Law''; and there is no claim that they or either of them have failed to comply with the provisions of that law.

The ''practice of law'' and what constitutes ''law business'' in Tennessee are defined by statute, as set out in Section 29-302, T. C. A., which is as follows:

''29-302. Definition of practice and business.— The 'practice of law' is defined to be and is the appearance as an advocate in a representative capacity or the drawing of papers, pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or prospective before any court, commissioner, referee or any body, board, committee or commission constituted by law or having authority to settle controversies. The 'law business' is defined to be and is the advising or counseling for a valuable consideration of any

person, firm, association, or corporation, as to any secular law, or the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights, or the doing of any act for a valuable consideration in a representative capacity, obtaining or tending to secure for any person, firm, association or corporation any property or property rights whatsoever.''

█ Tennessee cases dealing with the subject of unlawful practice of law are Grocers & Merchants' Bureau v. Gray, 6 Tenn. Civ. App. 87; Haverty Furniture Co. v. Foust, 174 Tenn. 203, 124 S. W. (2d) 694; State ex rel. District Attorney v. Lytton, 172 Tenn. 91, 110 S. W. (2d) 313; and Union City & Obion County Bar Ass'n. v. Waddell, 30 Tenn. App. 263, 205 S. W. (2d) 573. None of these cases, however, throws any real light on the issues to be determined in the instant case, and we, therefore, feel constrained, as did the learned Chancellor, to consider the case before us as one of first impression in Tennessee. In disposing of this question, it is our idea that, in fixing the public policy of this State, we should consider of primary importance the effect which it will have in protecting the rights and interests of the public, rather than the benefits which may accrue to lawyers of this State, represented by the Bar Association complainants. As was stated by the Committee on Unauthorized Practice of Law of the American Bar Association, in 56 American Bar Association Reports, pages 470-477:

''The practice of law by unauthorized persons is an evil because it endangers the personal and property rights of the public and interferes with the

proper administration of justice. It is not an evil because it takes away business from the lawyers."

To the same effect, we quote the language of the Supreme Judicial Court of Massachusetts, as follows:

"The justification for excluding from the practice of law persons not admitted to the bar is to be found, not in the protection of the bar from competition, but in the protection of the public from being advised and represented in legal matters by incompetent and unreliable persons over whom the judicial department could exercise little control." Lowell Bar Ass'n. v. Loeb, 315 Mass. 176, 52 N. E. (2d) 27, 31.

Apparently entertaining this same point of view, the Supreme Court of Tennessee, in a disbarment case, said:

"This power of disbarment is not exercised by the courts for the purpose of enforcing remedies between the parties, but to protect the court and the public against the official administration of an attorney guilty of unworthy practices in his profession." Davis v. State, 1893, 92 Tenn. 634, 640, 23 S. W. 59, 61.

In the case of Conway-Bogue Realty Investment Co. v. Denver Bar Ass'n, 135 Colo. 398, 312 P. (2d) 998, 1007, in denying injunctive relief prohibiting real estate brokers from preparing contracts, deeds, deeds of trust and releases, and giving advice to the parties relative to the legal effect of such instruments, the Supreme Court of Colorado said:

"We feel that to grant the injunctive relief requested, thereby denying to the public the right to conduct real estate transactions in the manner in

which they have been transacted for over half a century, with apparent satisfaction, and requiring all such transactions to be conducted through lawyers, would not be in the public interest; that the advantages, if any, to be derived by such limitations are outweighed by the convenience now enjoyed by the public in being permitted to choose either their broker or their lawyer to do the acts or render the services which the plaintiffs seek to enjoin.''

In Tennessee, the right of real estate brokers to draw documents appertaining to the business of real estate brokers is expressly preserved by statute, which, to some extent, in our opinion, indicates what the public policy of Tennessee should be in the instant case. The statute which prohibits the drawing, by real estate brokers, of legal documents not connected with the real estate business, but preserves that right to them, if such document pertains to real property, is set out in Section 62-1325, T. C. A., as follows:

''Any person licensed hereunder that engages in drawing any legal document other than contracts to option, buy, sell, or lease real property, may have his or her license revoked or suspended as provided in this chapter.''

Although no similar provision is contained in the ''Title Insurance Law'', Sections 56-3401 to 56-3427, T. C. A., we think the principle is the same, and that title insurance companies should not, by narrow or strained construction, be prohibited by court decisions from drafting legal documents which are intimately connected with the business for which they are chartered. The public policy of this State, established by court decisions, should

128

be kept in harmony with public policy established by statute. This conclusion is fortified by the reasoning of the Supreme Court in the case of Haverty Furniture Co. v. Foust, 174 Tenn. 203, 124 S. W. (2d) 694.

It is conceded on behalf of complainants in the instant case, that the defendants may properly ascertain as a condition precedent to the issuance of a title guaranty policy or a commitment for such policy, that the title to be guaranteed is good, and that for such purpose they may properly have the investigation made by staff attorneys or other lawyers employed for that purpose. On the other hand, it is contended that the drafting of a deed, or trust deed, to convey the title can only be done properly by an attorney employed by the grantor or borrower, as the case may be, and that it is improper for such work to be done by either the staff lawyers or outside lawyers employed by defendants. Likewise, it is contended that it is improper for defendants' lawyers to draft or procure the execution of instruments necessary for the correction of defects in titles, or the making of such titles insurable. Also, it is contended that defendants should not be permitted, through their attorneys, to prepare and participate in escrow agreements where the issuance of a title guaranty policy is not contemplated. It is asserted that participation in or performance of any or all of these functions by defendants, constitutes unlawful practice of law. Many cases are cited by counsel for complainants as authorities to sustain this contention. Among the cases which most strongly support the contentions of counsel for complainants are Hexter Title & Abstract Co., Inc. v. Grievance Committee, 142 Tex. 506, 179 S. W. (2d) 946, 157 A. L. R. 268; Title Guaranty Co. v. Denver Bar Ass'n., 135 Colo.

423, 312 P. (2d) 1011; and Pioneer Title Insurance & Trust Co. v. State Bar of Nevada, Nev., 326 P. (2d) 408.

The cases supporting the contentions of complaint are, in our opinion, more than offset by cases sustaining, or tending to sustain, the position of defendants, such as LaBrum v. Commonwealth Title Co. of Philadelphia, 358 Pa. 239, 56 A. (2d) 246; Cooperman v. West Coast Title Guaranty Co., Fla., 75 So. (2d) 818; People v. Title Guarantee & Trust Co., 191 App. Div. 165, 181 N. Y. S. 52, affirmed in 230 N. Y. 578, 130 N. E. 901; Ingham County Bar Ass'n v. Walter Neller Co., 342 Mich. 214, 69 N. W. (2d) 713, 53 A. L. R. (2d) 777; Cowern v. Nelson, 207 Minn. 642, 290 N. W. 795; Lowell Bar Ass'n v. Loeb, Mass., 315 Mass. 176, 52 N. E. (2d) 27; and Liberty Mutual Ins. Co. v. Jones, 344 Mo. 932, 130 S. W. (2d) 945, 125 A. L. R. 1149. A careful investigation of all of the cases cited by counsel for the respective parties and by the amici curiae, indicates that the weight of authority is with the defendants.

In LaBrum v. Commonwealth Title Co., 358 Pa. 239, 56 A. (2d) 246, 248, the Supreme Court of Pennsylvania said:

"All the acts in question have to do with the transfer of title, that is, with conveyances and conveyancing. In order to decide whether defendant shall insure a title, defendant must first examine and pass upon the instrument or instruments evidencing the transfer. Its charter authorizes all steps necessary for the enjoyment of its corporate franchise. If examination of the instrument discloses defects the insurer thinks must be corrected before the title can be insured, it must of course be redrawn in the inter-

est of both insurer and insured. Drawing the instrument correctly in the first place is no more unauthorized practice of law than examining or approving it after it has been drawn, or returning it for correction after it has been found to have been erroneously drawn.''

Likewise, in Cooperman v. West Coast Title Company, Fla., 75 So. (2d) 818, 821, the Supreme Court of Florida, said:

"So we decide that what the companies do to inform themselves about the advisability of issuing a commitment and what they do to accomplish a transfer of title or interest of such kind that a policy of title insurance is warranted are not the services the performance of which amount to unauthorized practice of law.''

In State Bar Association of Connecticut v. Connecticut Bank & Trust Co., 20 Conn. Sup. 248, 131 A. (2d) 646, 648, the Supreme Court of Connecticut said:

"It should be borne in mind through this discussion that the choice of a criterion as to what constitutes the practice of law must be made from the standpoint of public protection, not from that of private advantage for either banks or lawyers. Merrick v. American Security & Trust Co., 71 App. D. C. 72, 107 F. (2d) 271, 282.''

In Cowern v. Nelson, 207 Minn. 642, 290 N. W. 795, 797, the Supreme Court of Minnesota, said:

"It is the duty of this court so to regulate the practice of law and to restrain such practice by laymen in a commonsense way in order to protect primarily

the interest of the public and not to hamper and burden such interest with impractical technical restraints no matter how well supported such restraints may be from the standpoint of pure logic.''

In Auerbacher v. Wood, 139 N. J. Eq. 599, 53 A. (2d) 800, 802, the Supreme Court of New Jersey, said:

''The court should be very cautious about declaring that a widespread, well-established method of conducting business is unlawful, or that the considerable class of men who customarily perform a certain function have no right to do so, or that the technical education given by our schools cannot be used by graduates in their business.''

Fully sensible of the great responsibility that rests on us in the instant case, and bearing in mind the wisdom embodied in the precedents and decisions of other jurisdictions, we have reached the conclusion that while some of the activities of the defendants constitute ''practice of law'' or the doing of ''law business'', they are all legitimately incidental to the main or principle business of defendants, which is title insurance; and, consequently they should not be adjudged to constitute unlawful practice of law, nor enjoined as such.

The view of the case which we have taken makes it unnecessary for us to consider or discuss whether the Chancellor was right or wrong in excluding the defendant Commerce Title Guaranty Company from the injunction granted by him against the Mid-South Title Company, its agent, and in dismissing the bill against the Commerce Title Guaranty Company.

It results that the action of the Chancellor in dismissing the bill against the Commerce Title Guaranty Company must be affirmed, but the decree granting injunctive relief against the Mid-South Title Company must be reversed and the bill filed in this cause dismissed. The costs of the cause will be adjudged against the complainants and their sureties on the cost and appeal bonds filed by complainants.

Carney, J., concurs.

Avery, P. J., (Western Section), (dissenting).

I am constrained to disagree with my learned colleagues in their final conclusions to their very excellent Majority Opinion filed in this cause, but I do agree with many of the statements made in the Opinion. Some of these with which I do agree in connection with the facts of this cause are as follows:

(1) ''These facts are fully set out in the Opinion of the learned Chancellor filed November 22, 1957, together with his reasoning and ruling on the issues presented'';

(2) That, the defendants, Commerce Title Company and the Mid-South Title Company, ''are, or were, operating under the provisions of Chapter 34, Public Acts of 1935, carried forward into Tennessee Code Annotated as Sections 56-3401 to 56-3427, inclusive, entitled 'Title Insurance Law' '';

(3) That Section 29-302 of T. C. A. defines the ''Practice of Law'' and it also defines the term ''Law Business'';

(4) Proper reference is made to the published Opinions of the Courts of Tennessee relative to the

"subject of unlawful practice of law", and that "none of these cases, however, throws any real light on the issues to be determined in the instant case, and we, therefore, feel constrained, as did the learned Chancellor, to consider the case before us as one of first impression in Tennessee";

(5) That in the consideration of this cause, "it is our idea that, in fixing the public policy of this State, we should consider of primary importance the effect which it will have in protecting the rights and interests of the public rather than the benefits which may accrue to lawyers of this State";

(6) "That the public policy of this State, established by court decisions, should be kept in harmony with public policy established by statute";

(7) "We have reached the conclusion that * * * some of the activities of the defendants constitute 'practice of law' or the doing of 'law business' ".

I disagree with my distinguished colleagues in their following conclusions:

(1) That notwithstanding the fact that some of the activities of the defendant constitute "practice of law" and the doing of "law business" * * "they should not be adjudged to constitute unlawful practice of law, nor enjoined as such".

It is my conception of the law in Tennessee, as defined by statute, that every person, association or corporation is prohibited from doing that which is defined as "practice of law" and that which is defined as "law business" unless he shall have been duly licensed therefor and while his license therefor is in full force and effect.

(2) It is my further conviction that when a valid statute defines a profession, whether it be law, medicine, teaching, engineering and others too numerous to mention, and forbids the practice of such profession without being duly licensed by the duly licensing authority and declares, as provided by the Constitution of this State, that the "Public Welfare Requires It", that Act must be accepted as fixing the public policy or the policy of the public until it is validly overthrown or repealed.

(3) I do not agree with the learned Chancellor in his determination that the bill must be dismissed as to the Commerce Title Company, for it is the title insurer as authorized by Sections 56-3401 to 56-3426, inclusive, of T. C. A. entitled "Title Insurance Law", and having delegated every authority it has to the Mid-South Title Company, as its agent, with no restrictions thrown about the agency over the way and manner it shall engage in the business of insuring titles, that when such agency has engaged in the practice of law its principal is not bound by such acts and not restricted by the same rules as the legal agency is subject to.

(4) I disagree with that statement in the Majority Opinion that:

"It is apparent from a consideration of the Chancellor's opinion, * * * that his decision was influenced or motivated by a desire to protect the lawyers of general practice from what he considered unfair competition."

Therefore, to me it is not a question for this Court to determine, nor was it a question for the Lower Court to determine, that the interest of the public is such that can be decreed by a court to overthrow the declaration of

the legislative body of the State declaring that the public welfare demanded the passage of a constitutional Act, if the doing of those things are prohibited by such a valid Act, for in so doing we bring about legislation by judicial act rather than legislative act.

The question which was for determination by the learned Chancellor and is now for determination by this Court, as I view the cause, is simply whether or not some of the acts of the Commerce Title Company and its agent, Mid-South Title Company, as carried into effect by the agent, in the process of insuring titles, violates the provisions of said Section 29-302 and its accompanying prohibiting law, which is Section 29-303. It seems very clear to me that no one but a licensed attorney is permitted to do that which is defined as "practice of law" or that which is defined as "law business", either or both, as set forth in said Section 29-302 as follows:

"Definition of practice and business. —

"The 'practice of law' is defined to be and is the appearance of an advocate in a representative capacity or the drawing of papers, pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or prospective before any court, commissioner, referee or any body, board, committee or commission constituted by law or having authority to settle controversies. The 'law business' is defined to be and is the advising or counseling for a valuable consideration of any person, firm, association, or corporation, as to any secular law, or the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or

relating to secular rights, or the doing of any act for a valuable consideration in a representative capacity, obtaining or tending to secure for any person, firm, association or corporation any property or property rights whatsoever.''

That part of Section 29-303 which reinforces the provisions of Section 29-302 is embraced in its first sentence, and the remaining portions of that Section simply provide punishment for the violation of the business of ''practice of law'' and the ''law business''. The first sentence thereof is as follows:

''No person shall engage in the 'practice of law' or do 'law business,' or both, as defined in Sec. 29-302, unless he shall have been duly licensed therefor, and while his license therefor is in full force and effect, nor shall any association or corporation engage in the 'practice of the law' or do 'law business,' or both, as defined in Sec. 29-302.''

Looking for a moment at the last clause in the paragraph immediately above quoted, let us see what some of our sister states have put in their statutes of a similar nature.

We first look at the State of Alabama. In its Code under Title 46, Section 42, the Legislature, under the heading ''Who may practice as attorneys'', describes the practice of law under four heads (a) (b) (c) and (d), but it is not necessary to quote them in full, for it concludes with this provision:

''* * * but any such person, firm or corporation engaged in preparing abstracts of title, certifying, guaranteeing or insuring titles to real or personal property are prohibited from preparing or drawing

or procuring or assisting in the drawing or preparation of deeds, conveyances, mortgages and any paper, document or instrument affecting or relating to secular rights, which acts are hereby defined to be an act of practicing law, unless such person, firm or corporation shall have a proprietary interest in such property, however, any such person, firm or corporation so engaged * * * guaranteeing or insuring titles shall be permitted to prepare or draw or procure or assist in the drawing or preparation of simple affidavits or statements of fact to be used by such person, firm or corporation in support of its title policies, to be retained in its files and not to be recorded.''

The Act then declares violations to be a misdemeanor, and provides punishment.

In the State of Mississippi by Section 8682 of the Mississippi Code, recompiled in Volume 6A, under the heading ''Unlawful to practice law without license—certain abstract companies may certify titles'', in its first sentence makes it a misdemeanor and fixes the punishment for the practice of law in violation of the same, and in defining what that criminal offense shall be, it is said:

''Any person who shall for fee or reward or promise, directly or indirectly, write or dictate any paper or instrument of writing, * * * or who shall write or dictate any bill of sale, deed of conveyance, deed of trust, mortgage, contract, or last will and testament, or shall make or certify to any abstract of title to real estate other than his own or in which he may own an interest, shall be held to be engaged in the practice of law.''

That Section then provides:

"* * * shall not, however, prevent title or abstract of title guaranty companies incorporated under the laws of this state from making abstract or certifying titles to real estate where it acts through some person as agent, authorized under the laws of the state of Mississippi to practice law; * * *".

In the State of Kentucky by Chapter 30, Sec. 30.170 of the Kentucky Revised Statutes, under the general heading "Court rules governing practice of law and State Bar", the Court of Appeals is authorized and directed to adopt and promulgate rules:

"(a) Defining the practice of law;"

and under the 2nd Section thereof, it is provided:

"The rules of court adopted and promulgated under this section shall supersede all laws or parts of law in conflict therewith, to the extent of the conflict."

Under the 3rd Section thereof, it is provided:

"No rule adopted and promulgated under this section shall prevent a person not holding himself out as a practicing attorney from writing a deed, mortgage or will, or prevent a person from drawing any instrument to which he is a party."

In the State of Arkansas, under the general heading "Attorneys at Law", Title 25, there are many provisions with respect to the practice of law, but the whole purport of what is meant is set forth in subsec. 25-211 and 25-213. The first paragraph of subsec. 25-211 is as follows:

"Unauthorized practice — Practice of law defined.—

"No person other than a natural person duly licensed and admitted to practice law under the laws of this state and rules and regulations prescribed by the Supreme Court of this State shall do any act or thing which constitutes the practice of law, and the doing of any of the following acts by any person, firm, or corporation, whether with or without compensation therefor is hereby defined as an act constituting the practice of law;"

Then subsec. 25-213 is as follows:

"Intent of act.—Subordinate to Supreme Court regulations.—

"It is hereby declared to be the intent of this act (secs. 25-211—25-214) to be in aid of and subordinate to the right of the Supreme Court of Arkansas to regulate and define the practice of law and prevent and prohibit the unauthorized or unlawful practice thereof by appropriate rules, orders and penalties."

It is, therefore, obvious that the Legislature in the State of Arkansas has set down a public policy by which it has declared that the rules and regulations set forth by the Supreme Court

"to regulate and define the practice of law and prevent and prohibit the unauthorized or unlawful practice thereof by appropriate rules"

do and will constitute that which protects the public interest.

In the Majority Opinion is cited LaBrum v. Commonwealth Title Co. of Philadelphia, 358 Pa. 239, 56 A. (2d) 246, as authority for the conclusions expressed. We think the Majority Opinion overlooks the fact that in the State of Pennsylvania there is a specific Act, Act April 29, 1874, same being Public Law 73, and in Sec. 29 thereof, which Act provides:

"Companies incorporated under provisions of this act for the insurance of owners of real estate, mortgages, and others interested in real estate, from loss by reason of defective titles, liens and incumbrances, shall have the power and right to make insurances of every kind pertaining to or connected with titles to real estate, *and shall have the power and right to make, execute and perfect such and so many contracts, agreements, policies and other instruments as may be required therefor.*" (Emphasis supplied.)

In that case the Supreme Court referred to the Act defining the practice of law and prohibiting any person to practice except a licensed attorney, and then it said, as shown in that part of the Majority Opinion quoted, relating to what the charter of the corporate defendant authorized it to do:

"Its charter authorizes all steps necessary for the enjoyment of its corporate franchise."

Of course that provision in its charter is reinforced by the above-quoted Public Law 73, Sec. 29, which in my opinion justified the Opinion of the Supreme Court of Pennsylvania in that case, but it is no authority for what constitutes matters in the public interest under our Tennessee statutes.

In the case of Cooperman v. West Coast Title Guaranty Co., Fla., 75 So. (2d) 818, 819, which is another one of the purported cases from the State of Florida relied upon in the Majority Opinion, we think that the Majority Opinion overlooks the fact that the judgment of the Lower Court under consideration by the Supreme Court, is as follows:

"After much pleading and intervening and taking of depositions, the chancellor decreed that these appellees could with impunity fill out standard forms of conveyancing instruments and alter them to suit the occasion, so long as they were acting as agents for their principals, the title insurance companies. He also held that these appellees could decide from the examination of abstracts and public and other records whether as agents they would grant commitments for policies of insurance eventually to be issued by their principals. He ruled that the companies could complete forms requisite to guaranty or insurance of loans by the Federal Housing Administration and the Veterans' Administration. 'Real estate brokers,' he decided, could complete standard conveyancing forms such as preliminary contracts, deeds, mortgages, notes, assignments and satisfactions where in the instruments, subsequent to the contract, only names, dates, descriptions, amounts and 'latest tax year liability' were to be inserted."

In addition to the one sentence quoted in the Majority Opinion, in the Cooperman v. West Coast Title Guaranty Company case, the Supreme Court further said:

"But what we have written applies only to the performance of those acts which are indispensable to the determination of insurability *and must not be construed as sanctioning a charge of any sort, in addition to the premium for the issuance of title insurance, or approving charges for services rendered in connection with the guaranty or insurance of loans by the Federal Housing Authority or the Veterans' Administration,* whether the loans be connected with title insurance transactions or not." (Emphasis supplied.)

And the Opinion was completed with this statement:

"In the main the decree is affirmed, but those parts of the decree inharmonious with the views we have expressed or with the case just cited are reversed.

"Reversed in part; affirmed in part."

In addition to the above, I think the Majority Opinion overlooks the fact that in that case there is not one single reference to a statute which defines "the practice of law" in the State of Florida. Certainly they had no such statute as we have in Tennessee.

In the case of State Bar Association of Connecticut v. Connecticut Bank & Trust Co., 20 Conn. Sup. 248, 131 A. (2d) 646, the Supreme Court of the State of Connecticut had under consideration Sections 7638-7641 of the General Statutes of the State of Connecticut, 1949. The suit was filed by the State Bar Association and undertook to restrain certain banks and trust companies from performing the functions which the Bar Association alleged to be "the practice of law", and in construing the provisions of the General Statutes of

that State with respect to the practice of law, it said that to constitute "the practice of law", service must be rendered for others. In the construction of the statutes which it had under consideration, the Supreme Court quoted with approval from Merrick v. American Security & Trust Company, 71 App. D. C. 72, 107 F. (2d) 271, just as stated in the Majority Opinion, but it nowhere had under consideration, if indeed it had such a statute in that State, where an insurance company was authorized to insure titles under a law which permits such. We must not overlook the fact that the defendant in the instant case is operating under a statute which authorizes it to do a particular business. Neither can we overlook the fact that the general banking business, such as was carried on by the defendants in this case of State Bar Association of Connecticut v. Connecticut Bank & Trust Co., is a much broader business in every scope of its activity than the business of insuring titles. Our general knowledge of the banking business everywhere in this country reveals the truth of the foregoing statement without elaborating at all upon any particular service that banks throughout the country render to the public.

In the case of Cowern v. Nelson, 207 Minn. 642, 290 N. W. 795, 797, the defendant was a real estate broker who was doing in great part just what the Mid-South Title Company was doing in this case. However, he had no license to practice law, but he was drawing instruments such as deeds, leases, transfers, and the like in connection with his real estate brokerage business, making charges therefor. The Lower Court, by its injunctive relief, enjoined defendant from doing any of those acts on the theory that he was engaged in unauthorized practice of law, as contained in "Laws 1931, c. 114 [M. S. A.

sec. 481.02]''. The Supreme Court of Minnesota only modified that injunction so as to prevent the defendant from making a charge for such action. In so doing, the Supreme Court of Minnesota said:

"By comity we accept the legislative declaration of policy relating to brokers contained in L. 1931, c. 114, and remand the case to the trial court with instructions to eliminate from the injunction any restraint on the defendant, when acting as a broker for the parties, or as agent for one of them, to a sale or trade or lease of property or to a loan, from drawing or assisting in drawing without charge therefor such papers as may be incident to such transaction."

It is very true that the Court in effect said that in rare cases in connection with the brokerage business where it becomes necessary to draft such instruments and where it was done without charge, the harm which would come therefrom would be less than the inconvenience the public might suffer, if it was necessary in such rare cases to call in a lawer for that purpose. In that case also the Legislature of Minnesota had undertaken to authorize such brokers to make a charge for that type of service, and in that connection the Supreme Court said:

"We do not accept the legislature's declaration that in such matters he may charge for such services."

In the case of Auerbacher v. Wood, 139 N. J. Eq. 599, 53 A. (2d) 800, 802, the Majority Opinion properly quotes a section thereof, but I think it overlooks the fact that this suit was filed by the Bar Association for the avowed and express purpose as set out in the bill in Chancery

to enjoin Charles A. Wood, who was not licensed to practice law in the State of New Jersey, from representing parties before the National Labor Relations Board, he not being an attorney. The Court refused the injunction upon the theory that the rule of the National Labor Relations Board gives to a party the right "to appear in person, or by counsel, or by other representative, or industrial relations consultant." I think the Majority Opinion overlooks the analysis of the work being done by defendant as determined from the facts of that case in that regard, for the Supreme Court of New Jersey said:

"In determining whether a man is practicing law, we should consider his work for any particular client or customer as a whole. I can imagine defendant being engaged primarily to advise as to the law defining his client's obligations to his employees, to guide his client along the path charted by law. This, of course, would be the practice of law. But such is not the fact in the case before me. Defendant's primary efforts are along economic and psychological lines. The law only provides the frame within which he must work, just as the zoning code limits the kind of building the architect may plan. The incidental legal advice or information defendant may give does not transform his activities into the practice of law. Let me add that if, even as a minor feature of his work, he performed services which are customarily reserved to members of the bar, he would be practicing law." (Emphasis supplied.)

Our statutes defining the "practice of law" and "law business" clearly indicate to me that the defendants are

engaged in the "performance of services which are customarily reserved to members of the bar".

I am further of the opinion that the analogy which the Majority Opinion makes of the case before us to the activities of a real estate broker in Tennessee, as regulated and set out in Section 62-1325, T. C. A., is inconsistent wherein the Majority Opinion states, in drawing the analogy, that:

> "The statute which prohibits the drawing, by real estate brokers, of legal documents not connected with the real estate business, but preserves that right to them, if such document pertains to real property, is set out in Section 62-1325, T. C. A."

And then it quotes that Section as follows:

> "Any person licensed hereunder that engages in drawing any legal document other than contracts to option, buy, sell, or lease, real property, may have his or her license revoked or suspended as provided in this chapter."

The Majority Opinion concludes from that provision that such a broker is authorized to write deeds, trust deeds, and the like, in connection with his business as a licensed real estate broker. I do not construe the above quote to mean that which the Majority Opinion specifically declares. I think that provision means just what it says, and that it only gives the real estate broker the right to prepare contracts, giving him the right to bind his client "to option, buy, sell, or lease, real property", but the preparation of the deeds and other documents necessary to a compliance with the executed contract which he draws are matters which the client must personally do

for himself or obtain the services of a lawyer to do. I think the Majority Opinion gives no effect to the preposition "to" immediately following the word "contracts". Certainly the Majority Opinion is correct in stating that no such provision is contained in the "Title Insurance Law", Secs. 56-3401 to 56-3427, T. C. A., by which the defendants operate their business. To me the principle and policy enunciated in the above quote, not being incorporated in the "Title Insurance Law", distinctly restricts the activity of a title insurer much more than the act licensing a real estate broker as it relates to activities referred to in our Statute as "practice of law" or that of "law business".

In subsection (b) of Section 56-3402, T. C. A., we find the definition of the phrase "Title Insurance Business", in the following words:

" 'Title insurance business' is defined to be the insuring or guaranteeing of titles to real property, or interests therein, or the validity, accuracy or sufficiency of liens or encumbrances thereon, provided that nothing contained in this chapter shall make it necessary for any corporation making abstracts of title; certifying to the correctness thereof; issuing certificates as to the record title to real estate, or furnishing information regarding title thereto, to comply with this chapter, when such information does not take the form of, and is not, in fact, an insurance of the title to real estate, or interest therein, or of such liens or other encumbrances."

Under Section 56-3403, T. C. A., the powers and authority of title companies are specifically set out under two headings as follows:

"(a) To own, lease or construct abstract or title plants, and to operate and maintain the same, and to make, certify, guarantee and issue abstracts of title.

"(b) To act as escrow agent in connection with any transaction relating to the purchase, sale, exchange, lease, mortgage, or other acquisition, disposition, or encumbrance of property, real or personal, or any interest therein."

There is nothing in the Act which authorizes the title companies to employ lawyers to act for others, nor to maintain Staff Lawyers who act for others brought into defendants' tunnel of operation as a title insurer. When it designates a salary for an employed lawyer, furnishes him with stationery, postage, office equipment, office, secretary, and everything necessary to the ordinary practice of law, screened by the title insurer's advertising, free of any rent insofar as actual payment is concerned, it cannot be said that such overhead being furnished him without charge and permitting him to use all of such facilities to engage, as the Majority Opinion has said, in "law practice" or "law business", and he does so for others, making a charge therefor, such as writing deeds of correction, warranty deeds, trust deeds, and other documents commonly known to be within the definition of our Statute defining "law business", puts the employer in the business of practicing law or doing law business illegally.

I think that counsel for the Bar Association of Tennessee and the Bar Association of Memphis, both incorporated, have aptly quoted from the case of San Antonio Bar Association v. Guardian Abstract & Title Co., 156

Tex. 7, 291 S. W. (2d) 697, 703, which Opinion indicates to be parallel issues in that case with these in the instant cause, and which supports my position as stated in this Opinion relative to the facts of this cause as related and governed by our statutes defining "law practice" and "law business" hereinbefore quoted. It further supports the injunctive relief granted by the learned Chancellor and will further support my Opinion to the effect that this injunctive relief should extend to the Commerce Title Company. In that case the Supreme Court of Texas said:

"To declare in rather general terms, as did the Court of Civil Appeals, that the injunction shall be inoperative whenever the third parties in question 'request' these lawyers to perform the services, would open the door to easy evasion of the order. At least for all practical purposes, such a modification might well protect the respondents where the 're-quest' is not genuine, but actually responds to the suggestion of a title insurance salesman or is otherwise influenced by the corporation. A whole system of operation built up over the years is hardly to be varied in its true consequences by some overnight change of this or that single feature or formality of it. If the intimate association now existing between the lawyers and the business corporation be continued in substantially its present form, it would be not at all unlikely for nongenuine 'requests' to be made, and this would probably happen in such a way that the vice in the request would be difficult of both detection and proof.

\* \* \* \* \* \*

"These latter risks we do not feel disposed to take after weighing them in the balance with other factors, including the claimed rights of the respondents that are urged as requiring a modification. The interests of the public are involved and are safeguarded by the decree. The respondents are in default to the public and have evidently profited by that default over the years. Two of them are lawyers and must, or should, have known that they were 'skating on thin ice' since the beginning. As indicated, we see good reason to doubt that any proper modification of the decree which might be devised could be of much practical value to them. No injunction decree will ever be perfectly just to both sides. In this case we consider it best to leave it as the trial court entered it, so that, if the respondents wish to pursue in future a somewhat similar course to what they have followed in the past, they will have the burden of justifying alleged new situations as they arise, rather than, by a purported modification, forcing the petitioners to carry all over again the burden they have carried for the public and the profession up to this point."

Now, as to the question of agency on the part of the Mid-South Title Company as the exclusive agent for the Commerce Title Company, it seems to me that it cannot be legally maintained that when it does the work outlined by the proof in this cause, and then writes the title insurance in the name of the principal or have an officer of its own to sign the title insurance contract, which is nothing more than an administrative act, there is no escape from the conclusion that the principal is engaged in the same business that its agent is performing, and particularly is

this true where they are each authorized to engage in title insurance business.

Furthermore, when a principal relegates itself to the position of permitting its agent to conduct its business, only reserving unto itself a monetary consideration for the use of its name upon a title policy as insurer thereof, does no less than assume an easy chair position and acquiesces in the conduct of its agent so as to make the agent's activity the same as if it were doing the same thing in the same way, and cannot escape the same legal restraints properly applied to its agent.

I do not conclude that the Chancellor's injunction is broad enough to restrain the defendants from all of the acts which I consider to be illegal practice of law as defined and made a public policy by T. C. A. Sections 29-302 and 29-303; but suffice it to say that I concur in his very able Opinion and the judgment that he has rendered in this cause which will in all probability remedy what I consider presently necessary.

In conclusion I might say that there is no other profession known to our American society and way of life that has given as much protection to the liberty, freedom and rights of the individual under our constitutional guarantees than the Legal Profession, and it is my conscientious conviction that it has been more concerned with that which is in the interest of the public, made up of every profession, vocation and avocation than any other group, and that which attempts to invade the rights guaranteed to the legal profession in this State by the Statute defining the "practice of law" and "law business", as is now under consideration in this cause, vitally and adversely affects the interest of the public.

Without quoting from the evidence which the Chancellor found preponderates in favor of the decree he entered, in which I concur, and with all due respect to the very high type and excellent staff attorneys, for whom I have the profoundest esteem, it seems to me that the proof clearly preponderates to the effect that the defendants through their advertising, their employees, and these salaried staff attorneys, whose every facility is furnished them free of charge, are operating a sort of mass production line of "law business" in such a fashion as that when an applicant for title insurance or an applicant for an examination of his title so as to determine whether it is an insurable title, whether he actually desires title insurance or not, has entered the corridor leading to the production line and passes through the door thereof, his chances of selecting a lawyer of his choice, other than one of the Staff Lawyers, may be embarrassing, and at most is very slim.