JoAnne CARDINAL, et al.,
Respondents,

v.

MERRILL LYNCH REALTY/BURNET,
INC., Appellant.

No. C3-88-57.

Supreme Court of Minnesota.

Dec. 23, 1988.

Rehearing Denied Jan. 30, 1989.

Gordon G. Busdicker, John F. Beukema, Wendy J. Wildung, R. Thomas Torgerson, Minneapolis, for appellant.

James N. Reuter, Jeffrey S. Johnson, Minneapolis, for respondents.

James R. Safley, Minneapolis, for Minnesota Ass'n of Realtors, amicus curiae.

James M. Neilson, Stephen J. Nash, Charles W. Philipsek, Anoka, for Minnesota State Bar Ass'n, amicus curiae.

COYNE, Justice.

Merrill Lynch Realty/Burnet, Inc. (MLRB) obtained accelerated review of a decision of the district court determining that it engaged in the unauthorized practice of law in violation of Minn.Stat. § 481.02 (1986) by charging and collecting a drafting fee for closing services in connection with the sale of real estate. This "test case" in an uncertified class action was tried on stipulated facts before the district court, which, pursuant to Minn. Stat. § 8.31, subd. 3a (1986), awarded judgment in favor of the plaintiffs in the amount of the $250 fee each paid MLRB, less that portion of the fee MLRB paid to record or file the closing documents. We reverse.

MLRB is a Minnesota corporation which has been licensed to do business as a real estate broker since July 1982. In July 1982 MLRB acquired Burnet Realty, Inc., a corporation licensed as a real estate broker since 1973. From 1973 until January 1985 Burnet or its successor MLRB maintained a closing department through which it provided "Closing Services" to persons who had retained either one to sell real property. The supervisor of the closing department was a licensed real estate agent but was not licensed to practice law.

The closing services made available by MLRB included the following tasks, not all of which were performed in every transaction:

Reviewing the conditions of the purchase agreement immediately following execution.

Ordering necessary searches, including judgment, bankruptcy, state and federal tax lien searches, special and pending assessment searches and real estate tax searches.

Ordering abstract continuations and/or Registered Property Abstracts.

Making certain that title extensions are delivered to buyer's attorney and/or the title insurance company in a timely manner, as per the purchase agreement, to ensure closing may take place on the agreed date.

Maintaining good communications during processing.

Notifying mortgagees of sale of property and ordering pay-off figures for first mortgages, second mortgages, home improvement loans and title 1 loans.

Notifying contract-for-deed vendors of sale and securing written pay-off figures and estoppel certificates. Asking and obtaining from the contract-for-deed vendor a deed for title transfer of real property in the event of a contract-for-deed balloon or pay-off.

Reviewing title insurance binder and/or title opinion to expedite closing. Bringing any title objections to the parties' attention.

Obtaining copies of financing contracts (mortgages, note and deeds/contract-for-deeds, assumption packages).

Selecting forms and preparing documents therefrom that Sellers will present at closing, including, but not limited to, deeds, contracts for deed, escrow agreements, affidavits, bills of sale, and, on occasion, assignments of contracts for deed (hereinafter "Closing Documents").

Forwarding Closing Documents for signatures in the event Sellers are unable to attend closing.

Arranging closing time. Correlating closing date and time with all involved parties. If possible, scheduling closing to allow sufficient time to get all information through normal channels and to prepare everything in advance for review by the parties or their counsel prior to closing.

Attending actual closing. Presenting the documents at closing, making a brief explanation of the documents to the Sellers, and answering questions that the Sellers may raise at closing concerning various aspects of the transaction. Having all documents signed and notarized as necessary.

Recording all documents with the appropriate counties, seeing that secured indebtedness such as mortgages and home improvement loans are paid off and satisfactions of such indebtedness are obtained, real estate taxes are paid or credited as agreed, assumption packages are prepared and delivered to appropriate lending institutions, and abstracts are returned to rightful parties, and performing other similar services that are necessary or helpful to close the transaction.

Disbursing funds.

Following-up: checking on pay-off of special assessments and disbursing escrow amounts.

Prior to January 11, 1983, Burnet Realty and then MLRB charged a percentage commission based on the sale price of the property as compensation for all services provided the sellers of real property—including advertising, marketing, and closing services. Beginning January 11, 1983, MLRB charged a separate and additional drafting, recording, and closing fee of $250 in every transaction in which it performed any closing services, regardless whether it performed all or only some of the available closing services, or whether it prepared any of the documents used in the closing. The $250 flat fee included any document recording and filing fees chargeable to the seller of the real property. That practice continued until MLRB eliminated its closing department in January 1985. Since then requests for closing services have been referred to First Security Title Co., a wholly-owned subsidiary of MLRB.

The stipulated facts of the two subject transactions are uncomplicated, and the

parties themselves have thereby chosen to limit this court's inquiry. In 1983 plaintiff JoAnne Cardinal entered into an exclusive listing agreement with MLRB. The sale of the Cardinal property was closed in November 1983. An MLRB closer who is neither a licensed real estate broker nor a licensed attorney drafted conveyances and other closing documents, using preprinted forms, and provided closing services. At the time of the closing Cardinal paid MLRB the agreed upon brokerage fee and the additional drafting, recording, and closing fee of $250. MLRB paid recording fees of $21.50 for the recordation of certain closing documents.

In 1984 plaintiffs Michael E. Orman and Anne S. Orman entered into an exclusive listing agreement with MLRB. The sale of the Orman property was closed in May 1984. An MLRB closer who had formerly been licensed as a real estate salesperson but who has never been licensed as an attorney, prepared for, arranged, and organized the closing and drafted certain closing documents, using preprinted forms. Orman, a licensed and practicing lawyer, drafted the deed which was delivered to the buyers. Before the closing Orman had asked if MLRB would waive the $250 drafting, recording, and closing fee in the event Orman drafted the closing documents. MLRB declined to waive or reduce the fee of $250 regardless whether Orman drafted some or all of the closing documents. An MLRB closer, licensed as a real estate salesperson but not as an attorney, attended the closing. At the time of the closing Orman paid MLRB the agreed upon brokerage fee and the additional $250 fee. MLRB paid recording fees of $8 for recordation of certain closing documents.

On these simplified facts the trial court concluded that MLRB, by charging and collecting a drafting fee, had engaged in the unauthorized practice of law in violation of Minn.Stat. § 481.02 as interpreted by this court in *Cowern v. Nelson*, 207 Minn. 642, 290 N.W. 795 (1940). The trial court also concluded that section 481.02 regulates un-

lawful practices in business, commerce or trade within the purview and meaning of Minn.Stat. § 8.31, subd. 1 (1986) and that, therefore, the plaintiffs are entitled to recover the drafting fees less the amounts expended to pay recording fees.

It is important to point out again that the parties themselves have not asked this court to resolve the more difficult question which obviously underlies this controversy, namely, whether in the provision of the specified services, MLRB crossed that fine line between facilitating the completion of the transaction in the ordinary course of its real estate business and offering and providing those services which the public has the right to assume are within the specialized knowledge, skill, and training of one admitted to the practice of law. The use of this uncertified class action would have made it difficult if not impossible to gather sufficient plaintiffs who would contend that their transactions were exceedingly complex, that services and knowledge beyond the routine were required and made available, and that potential conflicts of interest might exist. Because the plaintiffs selected the more expeditious route and tailored their pleadings and claims accordingly, this court cannot and will not go beyond those limitations and offer an advisory opinion on that more difficult question.

It is unlawful for any person or association of persons, except members of the bar of Minnesota admitted and licensed to practice as attorneys at law, to hold out as qualified to give legal advice or to prepare legal documents or, for or without consideration, to prepare any legal document, except as provided by subdivision 3 of Minnesota Statute section 481.02. Minn.Stat. § 481.02, subd. 1 (1986). A similar prohibition is applicable to corporations organized for profit. Minn.Stat. § 481.02, subd. 2 (1986). Subdivision 3 of section 481.02 excepts certain conduct from the statutory prohibitions. Two clauses of subdivision 3 are pertinent here—

The provisions of this section shall not prohibit:

\*    \*    \*    \*    \*    \*

(3) any one, acting as broker for the parties or agent of one of the parties to a sale or trade or lease of property or to a loan, from drawing or assisting in drawing, with or without charge, papers incident to the sale, trade, lease, or loan;

* * * * * *

(9) any person or corporation from drawing, for or without a fee, farm or house leases, notes, mortgages, chattel mortgages, bills of sale, deeds, assignments, satisfactions or any other conveyances except testamentary dispositions and instruments of trust * * * *

While in modern times this court has not had the occasion to address or define the parameters of the phrase "unauthorized practice of law" in the context in which this challenge arises, almost 50 years ago we accorded, as a matter of comity, limited acceptance of the legislative declaration of public policy embodied in the statute now codified as Minn.Stat. § 481.02, subd. 3(3) (1986). *Cowern v. Nelson,* 207 Minn. 642, 647, 290 N.W. 795, 797 (1940).

In *Cowern,* the defendant was not a lawyer but had been engaged in the real estate business, acting from time to time as agent or broker for one or both parties to a sale, trade, or lease of property, or to a loan. In this capacity, he regularly drew and prepared purchase money contracts, deeds, contracts for deed, leases, notes, mortgages, satisfactions, bills of sales, assignments, and other instruments of conveyance, sometimes for a fee and at other times without a fee. At times he drew and prepared the documents while acting as agent or broker for one or more parties to the transaction, but on other occasions he acted for others in matters unrelated to his real estate business; he personally selected the form of instrument, determined its suitability and adaptability to the requirements of the transaction, advised the interested parties regarding the legality and legal effect of the instrument drawn and of their rights under it, and told them when and where the documents should be filed and the legal effect of filing.

The defendant in *Cowern* conceded the impropriety of drawing instruments for persons for whom he was not acting as real estate broker or agent, and he also conceded that he could not charge a fee even when he was acting as broker or agent. Accordingly, the court modified the restraint imposed by the injunction to permit defendant to draw instruments without charge in those transactions in which he acted as broker or agent.

The rationale for the court's conclusion that the public welfare did not require restraint on a person acting as agent or broker for any party to a sale, trade, or lease of property or to a loan from drawing the documents incident to the transaction is set out with faultless clarity:

> The line between what is and what is not the practice of law cannot be drawn with precision. Lawyers should be the first to recognize that between the two there is a region wherein much of what lawyers do every day in their practice may also be done by others without wrongful invasion of the lawyers' field. We think that ordinary conveyancing, part of the every day business of the realtor, is within that region and consequently something of which the legal profession cannot under present circumstances claim that the public welfare requires restraint by judicial decree. It is the duty of this court so to regulate the practice of law and to restrain such practice by laymen in a common sense way in order to protect primarily the interest of the public and not to hamper and burden such interest with impractical technical restraints no matter how well supported such restraint may be from the standpoint of pure logic. Viewing the problem before us in that light, we do not think it would be in the interest of the public welfare to restrain brokers from drafting the ordinary instruments necessary to effectuate the closing of the ordinary real estate transaction in which they are acting. We do not think the possible harm which might come to the public from the rare instances of defective conveyances in such

transactions is sufficient to outweigh the great public inconvenience which would follow if it were necessary to call in a lawyer to draft these simple instruments. *Id.* at 646–47, 290 N.W. at 797. In so approving the performance of the incidental services, however, the court rejected the legislative approval of the notion that the nonlawyer could charge for the performance. *Id.* at 647, 290 N.W. at 797.

The unauthorized practice issue resurfaced in a 1951 attempt by members of a bar committee to enjoin certain activities of a public accountant who, after three years of service as a United States deputy collector of internal revenue, held himself out by advertisement as an "Income Tax Expert" duly qualified to give advice and assistance to the public with respect to the making of federal income tax returns. *Gardner v. Conway*, 234 Minn. 468, 48 N.W.2d 788 (1951).

Noting that a licensed bar subject to the supervision of the courts originated with a public demand for the exclusion of those who assumed to practice without being qualified, the *Gardner* court again looked to the public interest in choosing a criterion. Viewing the question from that perspective, the court first concluded that the answer did not lie in the distinction between the primary and the incidental aspects of the actor's business. If furnishing legal service is the primary business, the actor is engaged in the practice of law. That a nonlawyer's legal service is merely incidental to that person's regular business, however, is not decisive. The inquiry should be directed to the character of the legal question:

> Generally speaking, whenever, as incidental to another transaction or calling, a layman, as part of his regular course of conduct, resolves legal questions for another—at the latter's request and for a consideration—by giving him advice or by taking action for and in his behalf, he is practicing law if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand

the application of a trained legal mind. What is a difficult or doubtful question of law is not to be measured by the comprehension of a trained legal mind, but by the understanding thereof which is possessed by a reasonably intelligent layman who is reasonably familiar with similar transactions.

*Id.* at 481, 48 N.W.2d at 796.

Pointing out that

> [i]n restraining laymen from improper activity, the *difficult question of law criterion* is to be applied in a common-sense way which will protect primarily the interest of the public and not hamper or burden that interest with impractical and technical restrictions which have no reasonable justification[,]

*id.* at 481–82, 48 N.W.2d at 797 (emphasis in original), the court ruled that although the preparation of an income tax return was not itself the practice of law, the accountant had, incidental to preparation of the return, resolved some difficult legal questions which, taken as a whole, constituted the unauthorized practice of law. *Id.* at 483–84, 48 N.W.2d at 797–98.

We have quoted extensively from these earlier decisions to illustrate this court's abiding concern for the public interest in determining whether certain conduct constitutes the unauthorized practice of law and also the difficulty in defining with any precision that conduct which is unauthorized. The overriding consideration in the case before us, in keeping with our tradition in these matters, is the public welfare rather than the advantage that might accrue to lawyer or nonlawyer. We recognize today, as we did long ago, that the "interest of the public is not protected by the narrow specialization of an individual who lacks the perspective and the orientation which comes only from a thorough knowledge and understanding of basic legal concepts, of legal processes, and of the interrelation of law in all its branches." *Id.* at 480–81, 48 N.W.2d at 796.

However, it is dispositive of our determination that the plaintiffs here do not con-

tend that the documentation prepared by MLRB's closers involved anything out of the ordinary or that it presented difficult or doubtful questions which reasonably required the application of a trained legal mind. Nor do they complain of a lack of care or competence in the preparation of the documentation or in the closing of the transactions. They instead allege only that by charging and collecting a "drafting fee" MLRB engaged in the unauthorized practice of law.

Common sense suggests, however, that charging a fee for services which include the preparation of ordinary documentation for a real estate transaction does not convert a practice not otherwise unlawful into the unauthorized practice of law. MLRB could well have chosen to increase its rate of commission to reflect what would amount to the additional drafting fee and thereby hide the cost. That it instead opted for disclosure and enumerated the routine services encompassed by the fee is not determinative. While we do not disparage the rejection in *Cowern* of the legislative declaration that a real estate agent or broker may charge for drafting instruments of conveyance and other documents, we disapprove the uncritical application of the principle to the stipulated facts of this case.

We first note that the plaintiff's characterization of the $250 as a "drafting fee" is not altogether accurate. Certainly, under its pre–1983 practice, whatever drafting or other services were performed by MLRB were indirectly compensated through the commission it received on completing the sale. Apparently because it concluded the existing commission structure was not sufficiently profitable, MLRB imposed a separate and additional $250 drafting, recording and closing fee, leaving unchanged the percentage of the sales price on which its commission was calculated. The flat fee was imposed in every transaction without regard to the actual tasks performed, as is evidenced by the stipulated facts of the Orman transaction. The fee, then, was intended to cover reimbursement of ex-

penditures for recording fees as well as compensation for all closing services, including many tasks which do not fall within the ambit of the practice of law. To assert that whether conduct amounts to the unauthorized practice of law turns on what the actor calls the fee—on the mere designation of the charge as a "drafting fee"—is to exalt form over substance and to ignore the public welfare concerns.

That charging for a service is not alone determinative whether the service is or is not the unauthorized practice of law does not, however, mean that we concur in the legislature's declaration that a charge for the service is irrelevant. A charge for services usually reflects the parties' judgment of the value of those services. If a charge is made for the services, it is likely that both the actor and the recipient, as reasonably intelligent nonlawyers who are reasonably familiar with similar transactions, understand the legal question to be difficult or doubtful. An uncompensated service is much more likely to involve only uncomplicated questions. Hence, whether the service was performed for or without a fee is relevant to and a factor in, even though not determinative of, the decision whether the service constituted the unauthorized practice of law.

We observe, too, that the particular nature and difficulty of the legal questions involved in the transactions in issue here was neither pleaded nor proved. The thrust of this lawsuit was not that these transactions posed legal questions which demanded the expertise of one learned in the law nor that the plaintiffs were ill served but only that, by charging a separate fee for its services in connection with the documentation and closing of the transaction, MLRB engaged in the unauthorized practice of law.

On examining this record, we cannot conclude that there exists any evidence to support the conclusion that MLRB engaged in the unauthorized practice of law by performing the tasks indicated or by collecting a fee therefor. To so hold, we would be

required to disregard statutory guidelines, to overrule the difficult question of law criterion enunciated in *Gardner* or to direct the parties to retry this action on a theory which they have either ignored or rejected. None of these alternatives is acceptable. We do, however, agree with the observation of the amicus curiae Minnesota Bar Association that today residential real estate transactions tend to be far more complicated than they were 50 years ago and that that complexity may well call for the skill and knowledge of a licensed attorney. But, that is not the case before us, and we express no opinion as to the result in other than a simple real estate transaction.

REVERSED.

YETKA, KELLEY and POPOVICH, JJ., dissent.

YETKA, Justice (dissenting).

I respectfully dissent. I disagree with the majority's view that the parties' narrow, stipulated facts prevent us from deciding the broader issue of whether appellant's actions constituted the unauthorized practice of law. I would affirm the trial court and find that appellant's conduct did constitute the unauthorized practice of law.

As the majority recognizes, MLRB provided a variety of closing services for a fee of $250. This fee was charged even in cases where all the services were not performed. One of the services which appellant purported to perform was a review of the conditions of the purchase agreement immediately following its execution. Studying the conditions of a purchase agreement clearly involves legal judgment and is a duty that should be performed only by an attorney.

The majority also acknowledges that appellant was involved in "ordering necessary searches, including judgment, bankruptcy, state and federal tax lien searches, special and pending assessment searches and real estate tax searches." These services, as well as the ordering of abstract continuations and registered property abstracts, require legal judgments and constitute the practice of law.

I will not repeat all of the other "services" that the realtors could or would perform. They are outlined in the majority opinion. Suffice it to say that many of those services arguably are legal services as well. While portions of the services cited by the majority may not, by themselves, be the unauthorized practice of law, the services listed, taken together, do constitute unauthorized practice.

The majority argues that merely drafting an instrument for a fee does not constitute the practice of law; however, in *Cowern*, we held that it would and the facts here lead to such a conclusion.[1] The closing services provided by appellant for $250 were complex and implicated legal judgments and conclusions. That fee, together with the services outlined above, in my opinion, constitutes the practice of law.

The real concern of this court should be, as the majority opinion points out, the protection of the public. In my opinion, the services here and the method of their performance do little to protect buyers in real estate transactions. Because realtors have an incentive to sell property and close the deal as quickly as possible to collect their fee, buyers, unless they are attorneys, are largely left unprotected. Title records are replete with instances of defective conveyances drafted by realtors. Moreover, title transactions are becoming increasingly complex as real estate holdings such as condominiums and townhouses become more popular.

In many instances, a realtor who represents both a seller and a buyer at closing and charges each separately may be involved in an improper conflict of interest. Certainly, realtors, at the very least, should be required to disclose at or prior to closing

---

1. In *Cowern*, this court said: "We do not accept the legislature's declaration that in such matters he may charge for such services." *Cowern v.* *Nelson*, 207 Minn. 642, 647, 290 N.W. 795, 797 (1940).

who they represent and the charges made therefor.

In conclusion, I believe that the trial court decision should be affirmed and that the services outlined within for the fee charged do, in fact, constitute the unauthorized practice of law.

KELLEY, Justice (dissenting).

I join the dissent of Justice Yetka.

POPOVICH, Justice (dissenting).

I join in the dissent of Justice Yetka.