**In re FIRST ESCROW, INC., Respondent.**

**In re BEST ESCROW, INC., Respondent.**

Nos. 72686, 72688.

Supreme Court of Missouri, En Banc.

Oct. 27, 1992.

vided by two escrow companies constitute the unauthorized practice of law.[1] In *Hulse v. Criger,* 363 Mo. 26, 247 S.W.2d 855 (1952), the Court addressed this question as it applied to real estate brokers. It was noted in *Hulse* that:

> The duty of this Court is not to protect the Bar from competition but to protect the public from being advised or represented in legal matters by incompetent or unreliable persons.

*Id.* 247 S.W.2d at 857–8. In accordance with this principle, we now hold that escrow companies may fill in the blanks of certain standardized form documents otherwise prepared or reviewed by Missouri attorneys, but only under the supervision of and as the agents for an entity with a direct financial interest in the transaction. Escrow companies may not draft legal documents, select the form of documents used, nor provide legal advice to customers directly or through attorneys they employ.[2]

Robert O. Hetlage, Ian P. Cooper, St. Louis, for informant.

Theodore L. Johnson, III, Glenn P. Green, Springfield, for respondent First Escrow.

Terry C. Allen, Jefferson City, for respondent Best Escrow.

PRICE, Judge.

We are asked to decide whether real estate closing or settlement services pro-

## I.

The General Chairman of the Bar Committee filed informations charging respondents First Escrow, Inc., and Best Escrow, Inc., with the unauthorized practice of law and the unauthorized doing of law business[3] regarding the services they provide in connection with real estate closings in the Springfield area. The proceedings were consolidated and referred to The Honorable L. Glen Zahnd, Associate Circuit Judge of the Fifth Judicial Circuit, who was appointed Master by this Court. He

---

**1.** Best Escrow argues that the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601 *et seq.,* preempts our jurisdiction over settlement services that involve federally related mortgage loans. We disagree. *See* 12 U.S.C. § 2616; *Cippolone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992); *Sperry v. Florida,* 373 U.S. 379, 383, 83 S.Ct. 1322, 1324, 10 L.Ed.2d 428 (1963).

**2.** There appears to be no controversy regarding the right of escrow companies to perform basic closing services, such as: providing facilities for closing; conducting closings; witnessing the signing of documents; collecting and disbursing funds; delivering documents to interested par-

ties; filing documents for recording; ordering surveys; and ordering inspections.

**3.** Our statutes define the "practice of law" and the "law business" as distinct activities: the "practice of law" refers to the lawyer's role as an advocate before a court or another tribunal, whereas the "law business" covers all other aspects of law practice. §§ 484.010–.020. (All statutes are from RSMo 1986.) Technically, this decision concerns "law business", although for ease of discussion we have used these terms interchangeably except where otherwise indicated.

found the following pertinent facts from a stipulated record:

(1) Respondents hold themselves out to the public as escrow and closing service companies. Neither respondents nor any of their regular employees are licensed to practice law in the State of Missouri. First Escrow has been operating a real estate closing and escrow service since 1980; Best Escrow has done so since 1985. First Escrow is licensed by the State of Missouri as a corporation real estate broker; Best Escrow is operated by a licensed real estate broker.

(2) Depending on the particular transaction, respondents complete pre-printed forms of documents, including but not limited to general warranty deeds, corporation warranty deeds, quit claim deeds, promissory notes, deeds of trust, affidavits of possession and title, HUD settlement statements and receipts, IRS Forms 1099, and property inspection certificates. Respondents discern the information needed to complete these forms from the written real estate contract and from communications with the parties and any attorneys, title insurers, or lenders involved in the transaction. Best Escrow has occasionally prepared bulk transfer notices, contracts for deed, and other nonstandard real estate contracts. First Escrow does not prepare nonstandard documents such as contracts for deed, leases, lease-purchase agreements, or wrap-around notes and deeds of trust. If the parties desire such documents and neither party has an attorney, First Escrow may request its own corporate attorney to prepare the documents for them.

(3) All forms used by respondents have been prepared or approved by an attorney licensed to practice law in the State of Missouri. Respondents make no changes to these forms except at the direction of an attorney. In transactions involving a lender the loan documents are provided or approved by the lender.

(4) Respondents ordinarily charge a flat fee for each closing whether or not any documents are prepared. This fee is usually divided equally between the parties. Respondents do not receive compensation from other service providers.

(5) Respondents do not represent themselves to the public as experts in preparing documents or as capable of giving legal advice. They do not act as lenders, title insurers, or brokers; negotiate transactions or prepare purchase and sale contracts; judge the legal sufficiency of documents, analyze legal descriptions, or advise customers as to their legal rights and obligations. Respondents' customers are usually not represented by attorneys.

(6) Brokers and lenders in the Springfield area have virtually abandoned in-house closings, particularly for residential transactions, and primarily use independent closing and escrow services such as respondents'. Further, buyers in the secondary mortgage market are requiring the use of independent closing companies. Respondents' activities are furnished in essentially the same manner as they were previously provided in-house by brokers and lenders in the Springfield area.

The Master concluded that community practice, public acceptance, and the expectations of the real estate mortgage industry make the extension of the rationale of *Hulse v. Criger* to escrow companies a reasonable and logical one. Thus, he held that respondents are engaged in a business separate and distinct from conveyancing; that an ancillary and essential part of this business is filling in the blanks of pre-printed forms of documents; and that this business is merely the clerical service of complying with the agreement of the parties, requiring only ordinary intelligence rather than legal skills.

The Master also made a number of specific recommendations to the Court. The general content of these recommendations can be summarized as follows:

(1) The completion of simple, standardized forms of documents is ancillary to and an essential part of the escrow closing busi-

ness and, therefore, does not constitute the unauthorized practice of law.

(2) The preparation of nonstandard or specialized documents such as contracts for deed, special warranty deeds, leases, lease-purchase agreements, easement agreements, well agreements, trustee deeds, and wrap-around notes and deeds of trust is the unauthorized practice of law.

(3) Any forms used by escrow companies must be prepared or approved by legal counsel.

(4) Escrow companies may not give advice or opinions as to the legal rights of their customers, the legal effect of instruments, or the validity of titles to real estate.

We commend the Master for his thorough and comprehensive work. As dis-cussed more specifically below, we adopt the substance of his recommendations.

### II.

It is the responsibility of the judiciary to determine what constitutes the practice of law, both authorized and unauthorized. *Reed v. Labor and Indus. Relations Com'n,* 789 S.W.2d 19, 20 (Mo.banc 1990). Respondents' document preparation activities constitute the practice of law or the doing of law business in Missouri,[4] because they involve "the drawing or the procuring of or assisting in the drawing [5] ... of any paper or document or instrument affecting or relating to secular rights." [6] This conclusion is implicit in *Hulse,* which held that the completion of standardized forms *by brokers* under the circumstances stated in that case "is not

---

**4.** Other courts differ on whether closing activities are the practice of law. Some hold that they are not. *See Miller v. Vance,* 463 N.E.2d 250, 253 (Ind.1984); *Lowell Bar Ass'n v. Loeb,* 315 Mass. 176, 52 N.E.2d 27, 31 (1943); *State Bar v. Kupris,* 366 Mich. 688, 116 N.W.2d 341, 343 (1962); *State ex rel. Johnson v. Childe,* 139 Neb. 91, 295 N.W. 381, 385 (1941); *Pioneer Title Ins. & Trust Co. v. State Bar,* 74 Nev. 186, 326 P.2d 408, 411 (1958); *State Bar v. Guardian Abstract & Title Co.,* 91 N.M. 434, 575 P.2d 943, 949 (1978); *Cain v. Merchants Nat'l Bank & Trust,* 66 N.D. 746, 268 N.W. 719, 723 (1936); *State Bar v. Security Escrows,* 233 Or. 80, 377 P.2d 334, 340 (1962). Others classify these activities as the practice of law and then grant nonattorneys limited authority to engage in them. *See Pope Cty. Bar Ass'n v. Suggs,* 274 Ark. 250, 624 S.W.2d 828, 830–1 (1981); *Conway-Bogue Realty Inv. Co. v. Denver Bar Ass'n,* 135 Colo. 398, 312 P.2d 998, 1005 (1957); *Federal Intermed. Credit Bank v. Kentucky Bar Ass'n,* 540 S.W.2d 14, 16 (Ky.1976); *State Bar Ass'n v. Ass'n of Realtor Bds.,* 93 N.J. 470, 461 A.2d 1112, 1114 (1983); *La Brum v. Commonwealth Title Co.,* 358 Pa. 239, 56 A.2d 246, 249 (1948); *Bar Ass'n v. Union Planters Title Guar. Co.,* 46 Tenn. App. 100, 326 S.W.2d 767, 781 (1959); *Cultum v. Heritage House Realtors,* 103 Wash.2d 623, 694 P.2d 630, 635 (1985); *State ex rel. Reynolds v. Dinger,* 14 Wis.2d 193, 109 N.W.2d 685, 689–90 (1961).

We agree with the latter courts that the preparation of closing documents is the practice of law, and as such is subject to this Court's inher-ent regulatory authority and continuing supervision:

> To the extent that there is an inevitable or unavoidable overlap between the realty and legal professions, the public's interest is safeguarded through ... the Court's continuing supervisory control.

*Ass'n of Realtor Bds.,* 461 A.2d at 1114.

**5.** Chief Justice Robertson's concurring opinion would hold that filling in the blanks in previously drafted legal forms is not the practice of law because it does not involve the "drawing" of legal documents. The statute, however, also encompasses "the procuring of or assisting in the drawing" of documents. § 484.010.2. These additional words mandate a broader reading.

The crucial consequence of this distinction (whether respondents' activities are not the practice of law, or alternatively, are the authorized practice of law by a nonlawyer) is the Court's supervisory power. If filling in blanks on real estate documents does not constitute the practice of law, then *anyone* may do it, *for compensation.* (See n. 7 below.)

**6.** This definition of "law business" from § 484.010.2 was cited favorably in *Hulse.* 247 S.W.2d at 860. While it is adequate for the issue before us, it should also be noted that "it is impossible to lay down an exhaustive definition of 'the practice of law.'" *State Bar v. Arizona Land Title & Trust Co.,* 90 Ariz. 76, 366 P.2d 1, 8–9 (1961).

*unlawful* practice of law."[7] 247 S.W.2d at 861 [emphasis added]. The question then arises, may escrow companies properly provide these legal services as the authorized practice of law?

## III.

Forty years ago, the Court legitimized the common practice of real estate brokers completing standardized forms in *Hulse v. Criger.* Many courts have since followed what is referred to as the "incidental" or "ancillary" test set out in *Hulse.*[8] There, the Court stated:

> We think the guiding principle must be whether under the circumstances the preparation of the papers involved is the business being carried on or whether this really is ancillary to and an essential part of another business. The simplicity and complexity of the forms, the nature and customs of the main business involved, the convenience to the public, and whether or not separate charges are made, all

have a bearing upon the determination of this question.

247 S.W.2d at 862. In reaching its decision, the Court in *Hulse* expressly recognized the need to balance the protection of the public against a desire to avoid unnecessary inconvenience and expense.

In holding that a real estate broker could properly complete standardized agreements, the Court was strongly influenced by two factors. First, the practice involved the completion of standardized forms:

> [O]ften they are simple enough so that such a form will suffice and the parties will wish to avoid further delay or expense by using them. So much real estate business is done in this way, without harmful results, that we do not think the public interest requires it to be changed.

*Id.,* 247 S.W.2d at 861.

Second, the Court noted the nature of the broker's role in a real estate transaction. Although a broker earns a commission

---

7. The concurring opinion also concludes that respondents cannot be held to be practicing law because our legislature has made it a crime for a nonlawyer to practice law in Missouri. § 484.020. But in fact, the legislature has criminalized the activities at issue here only when they are done for compensation: It is a misdemeanor for a nonattorney to perform *"for a valuable consideration"* services defined as the doing of "law business" (generally, giving legal advice, drawing legal documents, or securing property rights for others). §§ 484.010.2, 484.020. Both *Hulse* and our opinion today bar service providers from charging a fee for preparing legal documents; accordingly, these decisions do not conflict with our statutes. It is noteworthy that the "valuable consideration" language does not appear in the definition of the "practice of law." Thus, it is a misdemeanor for a nonattorney to act as an advocate in a representative capacity before a court or other tribunal, whether or not compensation is paid for the service. §§ 484.010.1, 484.020.

In any event, the General Assembly may only *assist* the judiciary by providing penalties for the unauthorized practice of law, the ultimate definition of which is always within the province of this Court. *In re Thompson,* 574 S.W.2d 365, 367 (Mo.banc 1978); *Hoffmeister v. Tod,* 349 S.W.2d 5, 11 (Mo. banc 1961); *Hulse,* 247 S.W.2d at 857.

8. *See Suggs,* 624 S.W.2d at 832–3; *Conway–Bogue Realty,* 312 P.2d at 1007; *Chicago Bar Ass'n v. Quinlan & Tyson,* 34 Ill.2d 116, 214 N.E.2d 771, 774 (1966); *Miller,* 463 N.E.2d at 253; *Loeb,* 52 N.E.2d at 31; *Petitions of Ingham Co. Bar Ass'n,* 342 Mich. 214, 69 N.W.2d 713, 717 (1955); *Pulse v. North Am. Land Title Co.,* 218 Mont. 275, 707 P.2d 1105, 1109 (1985); *Cain,* 268 N.W. at 723; *R.J. Edwards, Inc., v. Hert,* 504 P.2d 407, 417 (Okla.1972); *Childs v. Smeltzer,* 315 Pa. 9, 171 A. 883, 885–6 (1934); *Union Planters Title,* 326 S.W.2d at 781; *Commonwealth v. Jones & Robins,* 186 Va. 30, 41 S.E.2d 720, 727 (1947); *Cultum,* 694 P.2d at 634; *Dinger,* 109 N.W.2d at 690.

Some courts have employed different tests, such as: (1) acts customarily carried on by lawyers through the centuries, *Arizona Land Title,* 366 P.2d at 14; (2) acts affecting substantial legal rights and requiring legal skills, *The Florida Bar v. Irizarry,* 268 So.2d 377, 378–9 (Fla.1972); *Guardian Abstract,* 575 P.2d at 949; *Gustafson v. V.C. Taylor & Sons,* 138 Ohio St. 392, 35 N.E.2d 435, 437 (1941); *State v. Buyers Service Co.,* 292 S.C. 426, 357 S.E.2d 15, 17 (1987); (3) acts requiring the exercise of informed discretion in informing another of legal rights and duties, *Security Escrows,* 377 P.2d at 339; and (4) acts involving the resolution of a difficult question of law, *Cardinal v. Merrill Lynch Realty/Burnet,* 433 N.W.2d 864, 868 (Minn.1988).

when a ready, willing and able purchaser is found to take the property on the seller's terms, as a practical matter the broker needs to get an agreement in writing and to close the sale as promptly as possible to be paid. As such, a broker is "personally concerned in the transaction" and the broker's function is "commercial in character and not merely advisory." *Id.,* 247 S.W.2d at 860–1.

Thus, the *Hulse* Court rested its decision upon two grounds. First, that the transactions involved were "simple enough so that such a [standardized] form will suffice," and second, that the broker had sufficient identity of interest with the seller he represented to safeguard the proper completion of the transaction. *Id.,* 247 S.W.2d at 861.

■ The situation presented here regarding escrow companies, however, does not fall within the *Hulse* exception. While the relatively simple nature of the task of filling in form documents remains unchanged, and while the completion of these documents *may* be "incidental" to the closing process,[9] the escrow company does not have the requisite personal financial interest to safeguard the transaction. As was clearly noted by the Supreme Court of Washington:

> The interest of an escrow agent in the real estate transaction is not substantial enough to allow the services performed by it to fall within the [pro-se] exception.

*Bennion, Van Camp, Hagen & Ruhl v. Kassler Escrow,* 96 Wash.2d 443, 635 P.2d 730, 735 (1981).

Nonetheless, we are reluctant to automatically brand respondents' activities as the unauthorized doing of law business. *Hulse* established our duty to strike a workable balance between the public's protection and the public's convenience. To this end, we must determine if the rationale set out in *Hulse* should be extended to escrow companies.

## IV.

Courts in four other states have specifically considered the activities of escrow closing companies.[10] In the four decisions, two different concerns appear to have pre-

---

9. The Master found that the completion of standard form documents was ancillary to respondents' closing business. Informant argues that it is the primary business of escrow companies. Because this determination is not necessary to our decision, we do not address it.

10. The bulk of the opinions in this area have considered the role of brokers, title companies, and lenders. "Restrictive" courts strictly limit the functions that these service providers may perform in settling real estate transactions. "Permissive" courts grant them broad latitude to handle most if not all aspects of routine transactions.

(1) Brokers may fill in the blanks of standardized purchase/sale contracts containing their commission agreements, so long as they do not charge a fee for the service. Restrictive courts cut off the broker's role once the contract is executed. *See State Bar v. Arizona Land Title & Trust,* 91 Ariz. 293, 371 P.2d 1020, 1022 (1962); *Irizarry,* 268 So.2d at 379; *Quinlan & Tyson,* 214 N.E.2d at 774; *State v. Indiana Real Estate Ass'n,* 244 Ind. 214, 191 N.E.2d 711, 715 (1963); *Ass'n of Realtor Bds.,* 461 A.2d at 1115; *Gustafson,* 35 N.E.2d at 437; *Jones & Robins,* 41 S.E.2d at 727; *Cultum,* 694 P.2d at 634–5. Permissive courts allow brokers to conduct closings and fill in the blanks of ordinary standardized instruments such as deeds, leases, notes, mortgages, and trust deeds in transactions they have procured as brokers. *See Suggs,* 624 S.W.2d at 831; *Conway–Bogue Realty,* 312 P.2d at 1007; *Ingham Co.,* 69 N.W.2d at 718–9; *Hulse,* 247 S.W.2d at 862; *Childs,* 171 A. at 885–6; *Dinger,* 109 N.W.2d at 692.

(2) Title insurers may draft escrow agreements, trust provisions, and policies required to fulfill title insurance commitments, and may generally conduct closings when insuring title to the property. Restrictive courts draw the line at any activities not directly related to the issuance of title insurance. *See Coffee Cty. Abstract & Title Co. v. State ex rel. Norwood,* 445 So.2d 852, 854–5 (Ala.1983); *Arizona Land Title,* 366 P.2d at 12–3; *The Florida Bar v. McPhee,* 195 So.2d 552, 554 (Fla.1967); *Opinion No. 26, Comm. on the Unauthorized Practice of Law,* 130 N.J.L.J. 2, 26 (March 16, 1992); *Land Title Abstract & Trust Co. v. Dworken,* 129 Ohio St. 23, 193 N.E. 650, 651 (1934); *Hexter Title & Abstract Co. v. Grievance Comm.,* 142 Tex. 506, 179 S.W.2d 946, 951–2 (1944). Permissive courts allow title insurers to fill in the blanks of ordinary standardized forms, to draft curative instruments required by title commitments, and to draft escrow agreements and conduct closings when not insuring title to the property. *See Pioneer Title,* 326 P.2d at 411; *Guardian*

dominated with differing but predictable results. Washington and South Carolina focused primarily on the potential danger to the public from lay persons practicing real estate law. Minnesota and Oregon concentrated on a more practical and "common sense" analysis.

The Supreme Court of Washington voided a statute allowing escrow agents and officers to "select, prepare, and complete documents and instruments" relating to the refinancing, sale, or transfer of real and personal property, holding that it unconstitutionally authorized "the wholesale practice of law by a large group of lay persons." *Kassler Escrow*, 635 P.2d at 732–3. Central to this ruling was the potential danger to the public in allowing nonlawyers to be responsible for handling real estate conveyances. The court stated:

> Even the simplest of conveyances may involve issues of taxation, estate planning, future interests, water rights, equitable conversion, covenants, equitable servitudes, easements, statute of frauds and contract law. As stated in *Washington State Bar Ass'n v. Washington Ass'n of Realtors*, 41 Wash.2d 697, 712, 251 P.2d 619 (1952) (Donworth, J., concurring), "there is no such thing as a simple legal instrument in the hands of a layman." Even escrow agents who may be well trained in certain aspects of conveyancing could face complexities that are beyond the scope of that escrow agent's knowledge. Additionally, the agent could fail to identify and address obscure issues.

*Id.*, 635 P.2d at 733.

Likewise, the Supreme Court of South Carolina essentially precluded nonlawyers from all closing activities. *Buyers Service Co.*, 357 S.E.2d 15. This court held that not only the preparation of documents, but also the preparation of abstracts for nonattorneys, the closing of transactions, and the recording of documents all constitute the practice of law, stating that this policy:

> is for the protection of the public from the potentially severe economic and emotional consequences which may flow from erroneous advice given by persons untrained in the law.

*Id.*, 357 S.E.2d at 18.

On the other hand, the Supreme Court of Minnesota turned back a challenge to the activities of a real estate broker's closing department. *Cardinal v. Merrill Lynch Realty/Burnet*, 433 N.W.2d 864 (Minn. 1988). Although limited in scope, in that it did not address the "difficult question" of whether escrow closing services are engaged in the practice of law, the decision indicated a desire to address the issue in a "common sense" way. *Id.*, 433 N.W.2d at 869.[11]

Similarly, the Supreme Court of Oregon declined to follow what it termed the "artificial or haphazard" custom, payment, or incidental tests, but instead focused upon the "character" of the legal task and whether it would require the "exercise of discretion." *Security Escrows*, 377 P.2d at 338. After quoting New York Court of Appeals Justice Pounds' pronouncement on conveyances, that "[t]he most complex are simple to the skilled and the simplest often trouble the inexperienced", the Oregon court went on to state:

*Abstract*, 575 P.2d at 949, *appeal after remand,* 92 N.M. 327, 587 P.2d 1338, 1339 (1978); *La Brum*, 56 A.2d at 249–50; *Union Planters Title*, 326 S.W.2d at 780–1.

(3) Banks and trust companies may fill in the blanks of standardized real estate forms related to mortgage loans, so long as they do not charge a fee for the service. *See Miller*, 463 N.E.2d at 253; *Pulse*, 707 P.2d at 1109–10; *State v. Pledger*, 257 N.C. 634, 127 S.E.2d 337, 339–40 (1962); *Cain*, 268 N.W. at 723. They may also fill in standardized forms and give general advice in

tax and probate matters. *See State Bar Ass'n v. Conn. Bank & Trust*, 146 Conn. 556, 153 A.2d 453, 457 n. 3 (1959); *Loeb*, 52 N.E.2d at 34; *Childe*, 295 N.W. at 385; *Hert*, 504 P.2d at 419; *Brammer v. Taylor*, 175 W.Va. 728, 338 S.E.2d 207, 212 (1985).

11. The Minnesota court also utilized the "common sense" approach when it allowed real estate brokers to complete simple documents. *Cowern v. Nelson*, 207 Minn. 642, 290 N.W. 795, 797 (1940).

We believe there is a field in which lay conveyancers can perform a useful service without undue risk of harm to the public.

*Id.*, 377 P.2d at 338-9. The court held that escrow agents may fill in the blanks in warranty deeds, mortgages, and similar forms selected by their customers; and that if the customer did not know what forms to use or how to direct their completion, then he or she needed legal advice. *Id.*, 377 P.2d at 340. The court set out its test as follows:

> The line is drawn at the point where there is any discretion exercised by the escrow agent in the selection or preparation of an instrument with or without costs.

*Id.*, 377 P.2d at 339.

We find wisdom in both lines of decisions. The weakness of the differing approaches lies only in their failure to consider the strength of the other's position. While it may be unduly rigid to deny the public the convenience of the completion of certain standardized form documents by escrow companies, it also would be imprudent to allow such activity to be performed by individuals without legal training, who have no independent financial interest in the transaction. The potential for public harm is too great.

These goals do not appear to be necessarily irreconcilable. We believe that a proper balance can be maintained by allowing escrow closing companies to complete standard form real estate documents under the supervision of, and as agents for, entities or individuals who could otherwise meet the personal interest test and complete the form documents themselves. This distinction can best be understood from the historical development of the escrow closing business.

Interestingly, *Hulse* may have led to the predominance of escrow companies in the Springfield area, many of which were spun off by brokers to shed the expense and liability of real estate closings. Several witnesses testified that, between 1980 and 1981, most brokers and lenders in the Springfield area shut down their in-house closing departments and began utilizing outside escrow closing companies such as respondents, citing such factors as convenience, cost, efficiency, and increased federal reporting requirements.[12] By defining themselves as a distinct business, the escrow companies could charge a fee for the provision of closing services (although, as noted above, respondents do not make a separate charge for document preparation). In addition, they assumed the burden of liability for the preparation of documents, a burden that the local brokers and lenders were no longer willing to carry.[13]

Unfortunately, the shifting of liability to an entity with no personal interest in the transaction cuts directly against the *Hulse* rationale. Allowing a nonlawyer to perform such activities is justified only when that person's own financial interest and corresponding liability in the transaction creates an additional safeguard ensuring that the tasks will be performed correctly. We do not believe it is in the best interest of the public to delete this safeguard.

In short, we are willing to allow the *Hulse* test to be expanded to permit escrow companies to fill in the blanks of certain standardized form documents required to close real estate transactions only if they do so under the supervision of, and as agents for, a real estate broker, a mortgage lender, or a title insurer who has a

---

12. Depositions of Jerry W. Matney, August 13, 1991, pp. 8–9; Mary L. Henderson, February 15, 1991, p. 15; Thomas K. Barnett, pp. 10–11; Ted Hamilton, pp. 8–9; Judith B. Huntsman, pp. 9–11, 22; Joseph W. McCarty, Jr., pp. 11–12, 14–17.

13. Depositions of Thomas K. Barnett, pp. 11, 20; Ted Hamilton, p. 9; Judith B. Huntsman, pp. 9–11; Joseph W. McCarty, Jr., p. 17.

direct financial interest in the transaction.[14] These individuals or entities fit within the *Hulse* test [15] and their business experience and financial interest provide a safeguard to the public.

This requirement should not be an obstacle in obtaining services from escrow companies. The record below reveals that these companies work primarily for realtors, lenders, or title insurers, and that most or all of their customers are referred by area brokers or lenders.[16] Best Escrow stated in its brief that in the "vast majority" of transactions it handles, lenders, attorneys, or the parties themselves prepare all of their own papers.[17] Similarly, First Escrow indicated that realtors, lenders, title insurers, or attorneys are usually involved in its transactions, and that in 85–90% of its transactions a title insurer specifies the documents needed.[18] In fact, our holding reflects respondents' own understanding of their relationship with the referring service provider:

In the real estate broker-referred closings, First Escrow acts as a *sub-agent* of the listing broker and takes over *their* final duties of handling the closing, and, in fact, has agreements with many realtors providing as such. [Emphasis added.] [19]

We've always felt that we were just an *agency* of the listing broker and taking over *their* final duties of handling the closing. [Emphasis added.] [20]

In the sense that *Hulse* authorized realtors, and by implication lenders and title insurers, to complete closing documents,

we merely require that they retain responsibility for the acts of escrow companies if they choose to delegate this right and its corresponding duties to them. Both principal and agent will be responsible to the buyers or sellers of real estate for any damages they might suffer if a transaction is not properly closed.[21] In this regard, it is of comfort to note that each of these entities is subject to statutory licensing requirements and regulatory control, even though closing companies are not. Thus we allow the public the benefit of the efficiency offered by escrow companies, while still maintaining the safeguard originally created in *Hulse*.

## V.

The final issue to be addressed is the furnishing of legal services to the public by First Escrow's in-house counsel. This attorney maintains a law office within First Escrow's place of business, represents the corporation in litigation, and maintains its books and records. In addition, he is a partner in a title insurance agency, Preferred Title, which also shares office space with First Escrow and is partly owned by First Escrow's principal. Preferred Title occasionally furnishes the title insurance in transactions closed by First Escrow. The attorney's share of the office overhead and rent, as well as his compensation for serving as First Escrow's counsel, are "handled" by splitting the commissions received by Preferred Title between the attorney and the principal of First Escrow in accordance with a partnership agreement.

---

14. Of course, escrow companies may also complete documents under the supervision of a licensed attorney who represents one of the parties to the transaction.

15. *See Unauthorized Practice of Law Formal Opinions Nos. 6 and 38,* Admin. Advisory Comm. of the Missouri Bar.

16. Brief of First Escrow, p. 9; deposition of Mary L. Henderson, August 22, 1991, p. 28.

17. Brief of Best Escrow, pp. 22–23.

18. Brief of First Escrow, p. 15.

19. *Id.*

20. Deposition of Jerry W. Matney, August 13, 1991, p. 10.

21. *See Cultum,* 694 P.2d at 635 (brokers completing form agreements must comply with the standard of care of a practicing attorney).

When First Escrow's customers request a nonstandard document (such as a contract for deed) and neither party has an attorney, First Escrow's attorney may be requested to prepare the document on their behalf. The evidence shows that, at least some of the time, the parties are unaware of his involvement. The attorney testified that under such circumstances he considers himself to be representing the seller; nevertheless, his fee is normally split evenly between the buyer and the seller. This amount may appear in the closing statement as a document preparation or attorney's fee, or he may bill a party directly. The attorney estimated that he devotes 10–15% of his time to First Escrow's business. He does not discuss potential conflicts of interest with First Escrow's customers.

The most cursory reading of the Rules of Professional Conduct makes it clear that, in purporting to render services to First Escrow's customers in the absence of a formal attorney-client relationship, this attorney has incurred simultaneous duties to First Escrow, to his partner, to the seller, and to the buyer. Moreover, he has also acquired a prohibited personal interest in the transaction through the partnership agreement and the expense-sharing arrangements between First Escrow, Preferred Title, and his own law practice.

Every court that has considered this issue has found an inherent conflict of interest when a service provider's own attorneys purport to represent or furnish legal services to the provider's customers. Such dual representations have drawn universal condemnation, often accompanied by ominous references to the local professional ethics rules. *See Arizona Land Title*, 366 P.2d at 11; *State Bar Ass'n v. First Fed. Sav. & L. Ass'n*, 342 S.W.2d 397, 399 (Ky. 1961);[22] *Loeb*, 52 N.E.2d at 35; *Pioneer Title*, 326 P.2d at 411–2; *Opinion No. 26*, 130 N.J.L.J. at 26; *Dworken*, 193 N.E. at

652; *Hexter Title*, 179 S.W.2d at 953–4; *cf. Bowers v. TransAmerica Title Ins. Co.*, 100 Wash.2d 581, 675 P.2d 193, 199–200 (1983).[23]

We hold that attorneys for settlement service providers (including without limitation escrow closing companies, brokers, lenders, and title insurers) may not represent or furnish legal services to the provider's customers. Nothing herein contained prevents attorneys from rendering services directly to a service provider, such as reviewing the legal sufficiency of blank or completed forms for the protection of the provider alone. Nor does anything prevent attorneys from providing services directly to the parties to the transaction. Attorneys simply may not represent multiple parties with differing interests in a single transaction.

## VI.

Accordingly, we modify the recommendations of the Master as follows and hold that:

(1) Escrow companies may complete simple, standardized forms of documents, which do not require the exercise of judgment or discretion, under the supervision of and as agents for a real estate broker, a mortgage lender, or a title insurer who has a direct financial interest in the transaction, or a licensed attorney who represents one of the parties in the transaction.

■ (2) Escrow companies may not prepare contracts for the sale and purchase of real estate.

■ (3) Escrow companies may not prepare or complete nonstandard or specialized documents such as contracts for deed, special warranty deeds, leases, lease-purchase agreements, easement agreements, well agreements, trustee deeds, wrap-

---

**22.** In a subsequent opinion, however, the Supreme Court of Kentucky concluded that either the borrower's or the *lender's* attorney must review completed loan documents for sufficiency. *Intermed. Credit Bank*, 540 S.W.2d at 16.

**23.** *See also Unauthorized Practice of Law Formal Opinion No. 4*, Admin. Advisory Comm. of the Missouri Bar.

around notes and deeds of trust, or any other document that requires the exercise of judgment or discretion.[24]

■ (4) Any forms used by escrow companies must have been drafted or approved by legal counsel.

■ (5) Escrow companies may not charge a separate fee for document preparation, or vary their customary charges for closing services based upon whether documents are to be prepared in the transaction.

■ (6) Escrow companies may not draft legal documents, select the form of documents to be used, or give advice or opinions as to the legal rights of their customers, the legal effect of instruments, or the validity of titles to real estate.

■ (7) Attorneys who are engaged by an escrow closing company may not provide legal services to the company's customers.

■ The Master recommended the dismissal of the information against First Escrow, and the issuance of an injunction barring Best Escrow from preparing nonstandard settlement documents. Respondents have fully cooperated with informant and the Court in this matter and have indicated that they will voluntarily modify their business practices in conformity with our decision. In light of these representations, we do not think it necessary to issue injunctions against either respondent at this time. This disposition does not restrict any court from issuing appropriate injunctions in the future, in the event that any impermissible practices continue.

The informations are dismissed. Each party is to bear its own costs.

COVINGTON, HOLSTEIN and THOMAS, JJ., concur.

24. *Hulse* noted the difficulty in distinguishing between simple and complex documents or those that require the exercise of discretion and those that do not. We agree with the analysis in

ROBERTSON, C.J., concurs in result in separate opinion filed.

BENTON, J., and CROW, Special Judge, concur in opinion of ROBERTSON, C.J.

LIMBAUGH, J., not sitting because not a member of the Court when case was submitted.

ROBERTSON, Chief Justice, concurring in result.

This Court has long and properly held that it is the final arbiter in determining what acts constitute the practice of law. *Hulse v. Criger*, 363 Mo. 26, 247 S.W.2d 855, 857 (1952); *Reed v. Labor and Industrial Relations Commission*, 789 S.W.2d 19, 20 (Mo.banc 1990). The principal opinion defines certain clerical activities undertaken by respondents in this case as the practice of law. The principal opinion further determines that nonlawyers may provide these services given certain safeguards. I disagree with both of these determinations. First, I do not believe this Court's power to define the practice of law necessarily includes the power to authorize nonlawyers to engage in any aspect of that practice no matter how limited. Second, I do not believe that respondent's clerical activities, approved by the principal opinion as the "authorized practice of law" by nonlawyers, are in fact the practice of law.

Section 484.010.2, RSMo 1986, upon which the principal opinion relies, defines the "law business" as "the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights." Section 484.020, RSMo 1986, makes it a misdemeanor for any person not licensed to practice law to "do law business." Reading these statutes together, one finds a clear intent on the part of the General Assembly to assist the Court in protecting the public from receiving incom-

*Hulse* that this may be an issue of degree to be decided on a case by case basis. 247 S.W.2d at 862.

**850**

petent legal advice by unlicensed laypersons. The legislature makes it a crime for a nonlawyer to practice law. I see no good reason for the Court to diminish this protection by claiming that some law practice by nonlawyers may be authorized. In my view, and in the view of this Court from *Hulse* until today, only a lawyer is authorized to practice law in Missouri. If only lawyers may practice law in this state, it follows that respondents in this case may not engage in the activities under scrutiny here if they are the practice of law.

The *Hulse*/Section 484.010 definition of the law business focuses on the "drawing" of legal documents. The drawing of a legal document is more than the clerical act of filling names, legal descriptions and prices into blanks on form contracts. To draw a legal document is to use words to create legally binding rights and obligations and to delineate the boundaries of those rights and obligations. A blank form contract, drafted and approved by an attorney, has already created and defined the legal rights and obligations undertaken by those who wish to enter into it. The practice of law ends when the contract describing the standard transaction is completed in blank form. I would hold that the filling in of blanks in legal instruments, previously drafted by attorneys, using common knowledge regarding the information placed in those blanks, does not constitute the practice of law. This conclusion has been reached by a number of courts considering the question. *Miller v. Vance*, 463 N.E.2d 250 (Ind.1984); *Lowell Bar Ass'n v. Loeb*, 315 Mass. 176, 52 N.E.2d 27 (1943); *State Bar v. Kupris*, 366 Mich. 688, 116 N.W.2d 341 (1962); *State ex rel. Johnson v. Childe*, 139 Neb. 91, 295 N.W. 381 (1941); *Pioneer Title Ins. & Trust Co. v. State Bar*, 74 Nev. 186, 326 P.2d 408 (1958); *State Bar v. Guardian Abstract & Title Co.*, 91 N.M. 434, 575 P.2d 943 (1978); *Cain v. Merchants Nat'l Bank & Trust Co.*, 66 N.D. 746, 268 N.W. 719 (1936); *Oregon State Bar v. Security Escrows, Inc.*, 233 Or. 80, 377 P.2d 334 (1962).

The principal opinion is quite correct when it finds that the selection of the prop-

er form, the preparation of non-standardized contracts, and the provision of legal advice constitute the practice of law and may not be undertaken by laypersons. Further, I fully concur in the conclusion that attorneys employed by escrow companies may not provide legal services to the escrow company's customers.